**Richard WATERMAN, et al., Plaintiffs,**

v.

**Peter VERNIERO, et al., Defendants.**

**Civil Action No. 98–1398.**

United States District Court,
D. New Jersey.

June 29, 1998.

As Amended July 21, 1998.

Lawrence S. Lustberg, Mark A. Berman, Laura K. Abel, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Plaintiffs.

Ronald L. Bollheimer, Deputy Attorney General, Office of the Attorney General, Trenton, NJ, for Defendants.

### *OPINION*

WOLIN, District Judge.

The Constitution of the United States establishes courts to ensure that the government does not overstep its authority and infringe the rights of the people. Thus, courts are more than just arbiters of disputes between the people and the government—they are the wall that protects the people from the government. In this case, the Court must determine whether New Jersey violated Richard Waterman's and Michael Curtis's ("plaintiffs") rights to free speech under the First Amendment[1] when it enacted N.J.S.A. 2C:47–10, which prohibits inmates at the Adult Diagnostic and Treatment Center ("the ADTC") from possessing or obtaining "sexually oriented materials."

■ The Court's duty to the people includes plaintiffs even though they are inmates at the ADTC, which houses repetitive and compulsive sexual offenders, namely, pedophiles and incestuous fathers. As the Supreme Court stated: "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). However, prisoners retain their right to free speech under the First Amendment so long as it is "not inconsistent with [their] status as prisoner[s] or with the legitimate penological objectives of the corrections system." *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)).

Plaintiffs' status as inmates at the ADTC complicates the Court's task because the Court is acutely aware that society has become increasingly cognizant of the heinous acts that sex offenders commit and the hidden dangers that they create. This Court is particularly sensitive to the reality that pedophiles and incestuous parents prey on and harm defenseless children. Public consternation and disapprobation for this type of occurrence kindled the flame that fueled the New Jersey Legislature's enactment of Megan's Law. Thus, this case creates the unenviable judicial task of weighing the public's interest in protecting unsuspecting victims from sex offenders and the principles embodied in the Constitution.

Plaintiffs filed suit against Peter Verniero, the Attorney General of New Jersey, Jack Terhune, the New Jersey Commissioner of Corrections, and William Plantier, Superintendent of the ADTC, seeking to temporarily restrain New Jersey and defendants from enforcing N.J.S.A. 2C:47–10. On June 1, 1998, this Court issued an Order temporarily restraining New Jersey from enforcing N.J.S.A. 2C:47–10 and directing defendants to appear on June 16, 1998, to show cause why this Court should not preliminarily enjoin New Jersey from enforcing N.J.S.A. 2C:47–10.

■ Through application of the separation of powers doctrine, the Court acknowledges that it should defer to prison officials on penological issues and decisions. However, in this case, the degree of deference is lessened because the prison administrators were not involved in the decisionmaking process. Accordingly, the Court has determined that United States Supreme Court precedent and the principles embodied in the Constitution mandate that the Court enter a preliminary injunction and conduct a full trial to determine whether N.J.S.A. 2C:47–10 is constitutionally infirm. As shown in the body of this Opinion, the Court reached this conclusion after a thorough analysis of the four factors that must be considered prior to the issuance of a preliminary injunction.

At the outset, the Court notes that in deciding to issue the preliminary injunction, the Court relied on three bases. First, the

---

**1.** The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The First Amendment applies to the states through the Fourteenth Amendment.

Deputy Attorney General's comments during oral arguments that prison administrators planned to enforce the statute in a realistic fashion heavily influenced the Court's decision. Those comments indicate a strong probability that prison officials will arbitrarily enforce N.J.S.A. 2C:47–10 because they will have unlimited discretion in determining which "sexually oriented materials" enter the ADTC. Although New Jersey wants the Court to "trust" it in its enforcement of the statute, the potential for arbitrary enforcement portends that plaintiffs will prevail on the merits. Second, the language of the statute is so broad that it prohibits constitutionally permissible speech. Third, the statute's failure to define "associated anatomical area" chills plaintiffs' rights to free speech because they do not have fair notice of what the statute bans. For those reasons, the Court will preliminarily enjoin New Jersey from enforcing N.J.S.A. 2C:47–10.

## BACKGROUND

## I. Facts

### A. The ADTC and Plaintiffs

In 1976, the New Jersey Department of Corrections ("DOC") opened the ADTC in Avenel, New Jersey for the sole purpose of housing and serving sex offenders, i.e., pedophiles, child molesters, incestuous men, or rapists. To be admitted to the ADTC, sex offenders must exhibit sex offending behavior that is "repetitive and compulsive." The ADTC does not, however, house every repetitive and compulsive sex offender because of space limitations. Non-repetitive and non-compulsive sex offenders are housed in other institutions with the general prison population. The ADTC contains 750 inmates, and approximately 70% of the inmates are pedophiles and incestuous fathers.

The ADTC attempts to rehabilitate its sexual offenders differently than do the other prison facilities. The therapeutic staff, which includes psychologists, at the ADTC provides the inmates with intense sex offender treatment in the hope that it can reduce recidivism and contribute to public safety. Specifically, the ADTC employs a four-step program that "is designed to present infor-

mation and therapeutic experiences in a progressive order to ameliorate the offender's proclivity towards criminal sexual behavior." (Graffin Aff. ¶ 7). The different steps focus on the concepts of victim empathy and the offender's deviant sexual arousal. For example, the final step requires the offenders to demonstrate victim sensitivity and an ability to connect emotionally with others.

Plaintiff Waterman is currently serving a fifty-four-year sentence with twenty years of parole ineligibility for sexually abusing a nine-year old girl. Waterman has two previous convictions for pedophiliac offenses—one for abducting and raping an eleven-year old girl and the other for fondling a nine-year old girl in Florida. Plaintiff Curtis is currently serving a twenty-year sentence with ten years of parole ineligibility for sexually abusing and taking nude photographs of a fourteen-year old boy. Curtis also has a prior pedophiliac conviction—he received a sentence of probation and psychotherapy for sexually assaulting a fifteen-year old boy in Arizona.

### B. The Enactment of N.J.S.A. 2C:47–10

In March 1993, members of the New Jersey Assembly Judiciary, Law and Public Safety Committee toured the ADTC because it was considering New Jersey's involuntary commitment law. During the tour, Superintendent Plantier told the members of the Committee that the facility needed an additional $2 million for psychological staffing, research, and other program improvements. Plantier also conceded that approximately twenty-five percent of the inmates were incurable. At the time of the tour, the ADTC permitted inmates to pin nude photographs of women and some sexually oriented pictures on their walls. Some inmates took advantage of that opportunity. Prison officials believed that such photographs and pictures were progress for some inmates because in the past, they may have preferred photographs of little children in sexually explicit situations. The ADTC prohibited inmates from possessing photographs of children in their underwear. *See* Ron Marsisco, *Legislators Tour Avenel Sex Center,* The

Star Ledger, March 19, 1993, at 1993 WL 3454117.

Following Jesse Timmendequa's brutal murder of seven-year-old Megan Kanka, a State Senator introduced a Bill to ban obscene materials at the ADTC.[2] When the Bill was introduced, Plantier commented that "traditional pornography" was not the problem for the ADTC's pedophiles, and that he and other prison officials were more concerned about the children's sections in old Sears and J.C. Penney catalogs. *See* Bill Sanderson, *Proposals to Treat Molesters Ouestioned*, The Record, October 7, 1994, at A3.

Around the same time, New Jersey formed an eighteen-member task force to study the effectiveness of the ADTC. In late 1994, the task force visited the ADTC, and found that one inmate had sexually oriented photographs of a women on his walls. The task force also observed the artwork, including some nude pieces, in the art room where some inmates take five art classes per week. During the first public hearing, administrators at the ADTC stated that they did not know whether its treatment worked because they did not have the resources to conduct research. *See* Ivette Mendez, *Reality of Avenel Contradicts Public Perception*, The Star Ledger, November 13, 1994, at 1994 Wl 9378674. On June 19, 1995, the task force issued a report in which it made findings and recommendations. The twenty-page report did not mention or discuss whether inmates should be allowed to possess sexually oriented materials.

In early January 1998, the New Jersey Assembly and Senate passed a Bill that banned "sexually oriented and obscene materials" from the ADTC. The Senate passed the Bill without debate or dissent. *See* Eugene Kelly, *Bill Ok'd to Ban Porn in Prison Would Cut Sex Offenders' Access*, The Record, January 9, 1998, at Al. Prior to passing the Bill, neither the Assembly nor the Senate conferred with Dr. Nancy W. Graffin, the Program Director for the Treatment Services Department at the ADTC. In fact, she did not learn about its enactment until May 1998.

On January 9, 1998, a reporter wrote: "When a group of legislators toured the state prison for sex offenders two years ago, they were outraged to find pictures of naked women in some of the cells, and promised to do something about it." *Id.* Apparently, the drawings of naked bodies in the art class also offended certain lawmakers. *See id.* The DOC opposed the Bill, however, because it viewed it as vague, unnecessary, impractical, and perhaps unconstitutional.[3]

The DOC also reiterated its position that the inmates' problem was child and violent pornography, and not adult pornography, and that it was more concerned about the children's section of the Sears catalog. *See id.* Plantier specifically stated that counselors believed that the pedophiliac inmates' viewing of adult pornography was a step in the right direction. *See id.*

On January 19, 1998, Governor Whitman signed N.J.S.A. 2C:47–10, entitled as Receipt, possession or distribution of sexually oriented material, into law. The statute provides:

a. As used in this act, "sexually oriented material" means any description, narrative account display, or depiction of sexual activity or associated anatomical area contained in, or consisting of, a picture or other representation, publication, sound recording, live performance, or film.

b. An inmate sentenced to a period of confinement in the Adult Diagnostic Treatment Center shall not receive, possess, distribute or exhibit within the center sexually oriented material, as defined in subsection a. of this section. Upon the discovery of any such material within the center, the commissioner shall provide for its removal and destruction, subject to a departmental appeal procedure for the withholding or removal of such material from the inmate's possession.

---

2. Before committing the murder, Timmendequas served a sentence at the ADTC.

3. During oral arguments, the Deputy Attorney General stated that the DOC currently supports the statute.

c. The commissioner shall request an inmate sentenced to confinement in the center to acknowledge in writing the requirements of this act prior to the enforcement of its provisions. Any inmate who violates the provisions of subsection b. of this section shall be subject to on-the-spot sanctions pursuant to rules and regulations adopted by the commissioner.

d. A person who sells or offers for sale the material prohibited in subsection b. either for purposes of possession or viewing or who receives, possesses, distributes or exhibits any text, photograph, film, video or any other reproduction or reconstruction which depicts a person under 18 years of age engaging in a prohibited sexual act or in the simulation of such an act as defined in section 2 of P.L.1992, c. 7 (C.2A:30B–2), within the center shall be considered to have committed an inmate prohibited act and be subject to sanctions pursuant to rules and regulations adopted by the commissioner.

The effective date of the statute is June 1, 1998.

Prior to the enactment of N.J.S.A. 2C:47–10, prison officials throughout the DOC had the authority to remove obscene publications from inmates pursuant to N.J.A.C. 10A:18–4.9(a)(6). Obscene materials are defined as:

The publication contains material which, based upon the experience and professional expertise of correctional administrators and judged in the context of a correctional facility and its paramount interest in security, order and rehabilitation:

i. Taken, as a whole, appeals to a prurient interest in sex;

ii. Lacks, as a whole, serious literary, artistic, political or scientific value; and

iii. Depicts, in a patently offensive way, sexual conduct including patently offensive representations or descriptions of ultimate sex acts, masturbation, excretory functions, lewd exhibition of the genitals, sadism or masochism.

No one disputes, however, that N.J.S.A. 2C:47–10 prohibits more materials than does N.J.A.C. 10A:18–4.9(a)(6).

## II. Procedural History

On May 7, 1998, plaintiffs filed a *pro se* Complaint seeking (1) an order temporarily restraining defendants Peter Verniero, Attorney General of the State of New Jersey, Jack Terhune, Commissioner of Corrections of the State of New Jersey, and William Plantier, Superintendent of the ADTC,[4] from enforcing N.J.S.A. 2C:47–10, (2) to have the inmates at the ADTC certified as a class, (3) to be permitted to proceed *in forma pauperis*, and (4) to have counsel appointed. Plaintiffs alleged that the statute violates their constitutional rights because it prevents them from viewing certain materials. They also alleged that prison officials at the ADTC had confiscated certain films with "R" and "NC–17" ratings.

On May 19, 1998, the Court (1) denied plaintiffs' motion for a temporary restraining order because the papers failed to address the four factors needed to be considered for such a motion, (2) determined that the motion for class certification was premature, (3) reserved decision on the motion to proceed *in forma pauperis*, and (4) referred the request for counsel to Magistrate Judge Pisano. On May 21, 1998, Magistrate Judge Pisano granted plaintiffs' application for the appointment of counsel, and appointed Lawrence S. Lustberg of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., as plaintiffs' counsel. On May 28, 1998, the Court granted plaintiff's application to proceed *in forma pauperis*.

On June 1, 1998, plaintiffs' appointed counsel renewed plaintiffs' motion for a temporary restraining order against New Jersey and for an order directing New Jersey to show cause why the Court should not issue a preliminary injunction. On the same day, the Court granted plaintiffs' motion, and ordered that: (1) New Jersey was temporarily restrained from enforcing N.J.S.A. 2C:47–10; (2) New Jersey was temporarily restrained from prohibiting the inmates at the ADTC from viewing films with ratings of "R" and "NC–17;" (3) New Jersey must show cause on June 16, 1998, why the Court should not preliminarily enjoin New Jersey from enforc-

---

**4.** For the remainder of this Opinion, the Court will call defendants "New Jersey."

ing N.J.S.A. 2C:47–10 and from prohibiting the inmates at the ADTC from viewing films with ratings of "R" and "NC–17" until a full hearing is held on the constitutionality of N.J.S.A. 2C:47–10. On June 16, 1998, the Court heard arguments from both New Jersey and plaintiffs.

## III. The Experts

As part of their briefs, plaintiffs and defendants both submitted affidavits from psychologists. Not surprisingly, the psychologists differ on whether "sexually oriented materials" would have a negative, positive, or no impact on the treatment administered at the ADTC.

Defendants' first psychologist is Dr. Graffin, the current Director of Psychology at the ADTC. Dr. Graffin received her Ph.D. in Clinical Psychology from Pennsylvania State University in 1991, and she was a Principal Psychologist at the ADTC for nearly two years before becoming the Director of Psychology. Graffin asserts that "sexually oriented materials" may threaten the concepts of victim empathy and the sex offenders' understanding of deviant sexual arousal because those materials tend to objectify the individuals depicted and because they have the potential to trigger the offenders' deviant cycle. She emphasizes that the materials may "normalize the objectification of others," which would be detrimental to the sex offenders' treatment because they must overcome objectifying others if they are going to be successful in eliminating their deviant sexual desires.

Defendants also employ Dr. Timothy P. Foley who received a Ph.D. in psychology from Howard University in 1988. Dr. Foley has worked with sex offenders since receiving his Ph.D., and is currently the Director of Clinical and Forensic Services for the Joseph J. Peters Institute ("JJPI") in Philadelphia, Pennsylvania. The JJPI is a licensed psychiatric clinic that primarily evaluates and treats sexual predators. He learned about N.J.S.A. 2C:47–10 in early June 1998.

Dr. Foley opines "that allowing sexually oriented material in a facility dedicated to the treatment of sexual offenders, such as ADTC, is misguided and potentially dangerous" because studies show that some sex offenders use such material to advance their masturbatory fantasies in ways that differ from non-sex offenders; i.e., the materials may heighten the offender's arousal in seeing someone as a victim. He adds that the materials may lead to "trial runs" of the fantasies when the offenders are released from the ADTC. Moreover, Foley claims that the materials may prevent offenders from finding alternative outlets to their deviant arousals because they will fulfill their arousals by masturbating. Finally, he contends that the materials can lead to the notion that mature relationships, which include intimacy, can be achieved only through sex, and can increase the likelihood of recidivism because the offenders may become preoccupied with sex.

Plaintiffs' first psychologist is Dr. Philip H. Witt, who received his Ph.D. in clinical psychology from St. Louis University and currently works in private practice in New Jersey. Dr. Witt has spent approximately twenty years in the field of sex-offender treatment. Most notably, Dr. Witt worked at the ADTC for ten years, five of which were as Director of Psychology.

Dr. Witt agrees with Dr. Graffin's opinion that sexually oriented materials focus on sexual aspects of people rather than on relationships, but he explains that "[w]hether this type of erotica would be harmful to a sex offender depends upon the specific sex offender in question. It may harm some, and will have no effect, or a beneficial effect, on others." In fact, he asserts that adult-oriented erotica has been used for twenty years to treat pedophiles because it refocuses their sexual desires. He adds that therapists can deal with objectification and lack of empathy even if offenders are viewing sexually oriented materials.

Witt then addresses Foley's arguments. First, Witt claims that Foley's characterization that all erotica portrays people as victims is inaccurate because plenty of erotica is not victim oriented. Second, Witt contends that erotica triggers deviant sexual arousal in only some offenders, and that therapists can discuss the arousal during treatment. Third, Witt states that he is unaware of any studies

that support Foley's contention that empirical studies show that non-violent erotica of consenting adults are harmful to sex offenders. Finally, Witt notes that the ADTC permitted inmates to have erotica for many years, and that therapists should continue to deal with such materials on a case-by-case basis.

Plaintiffs' second expert is Dr. Carol J. Ball, who received her Ph.D. in counseling psychology from Indiana State University and currently works in private practice with, *inter alia,* deviant and compulsive sex offenders. Dr. Ball served four years as the Director of the Behavior Therapy Program and Behavioral Contracting Unit at the Massachusetts Treatment Center for Sexually Dangerous Persons.

Dr. Ball has used "age-appropriate erotic materials as a therapeutic aid to develop appropriate sexual arousal in certain sex offenders (*e.g.,* pedophiles)." She adds that such use is professionally accepted and critical to the normalization of sex offenders' sexual interests. Contrary to defendants' experts, Ball argues that an environment devoid of sexually oriented materials does not mean that sex offenders will not have deviant urges. Like Dr. Witt, Ball argues that sexually oriented materials must be assessed on a case-by-case basis because their effect will differ depending on the offender. Moreover, she states that no empirical study indicates that erotica like "Playboy" increase the risk of recidivism. Finally, Ball refutes the assertion that erotica objectifies women as a feminist position that many people do not hold. Furthermore, she states that sexuality is normalized in our society, and that therapists who shield patients "from the pervasiveness of sex in today's world is akin to hiding one's head in the sand."

## DISCUSSION

### I. Standard for Preliminary Injunctions

"Injunctive relief is an extraordinary remedy [that] should be granted only in limited circumstances." *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1426–27 (3d Cir.1994) (quotation omitted), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). In assessing whether a preliminary injunction is warranted, the Court must consider: (1) the likelihood that the plaintiff will prevail on the merits; (2) the extent to which the plaintiff will be irreparably harmed if the relief is not granted; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See, e.g., Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *Opticians Ass'n v. Independent Opticians of America,* 920 F.2d 187, 191–92 (3d Cir.1990). If plaintiffs fail to establish these elements, the Court must deny the request for a preliminary injunction. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989). In this case, the plaintiffs have established that they are entitled to a preliminary injunction.

### II. Reasonable Likelihood of Success on the Merits

Plaintiffs claim that they will succeed on the merits for three reasons. First, they contend that New Jersey cannot articulate a legitimate penological interest for N.J.S.A. 2C:47–10. They argue that the experts do not support New Jersey's purported interest of rehabilitating sex offenders and reducing recidivism, that New Jersey passed the statute as an "exaggerated response" to the task force's viewing of "Playboy" on the walls of certain inmates' cells, and that New Jersey developed that purported interest after it passed the statute. Second, they assert that the statute is overbroad. Third, they claim that the statute is void for vagueness. The Court will address each argument in turn.

### A. *Thornburgh* and *Turner:* Penological Interest and Other Factors

Prison inmates do not lose their constitutional rights when they become incarcerated, and free citizens do not lose their ability to "exercis[e] their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874, 1878, 104 L.Ed.2d 459 (1989). However, the difficulty in administering prisons tempers both the rights of those on the inside and outside. *See id.*

Moreover, courts pay affordable deference to prison administrators' decisions because they have the expertise needed to "regulate the relations between prisoners and the outside world." *Id.* at 407–08, 109 S.Ct. at 1878–89. Thus, the United States Supreme Court has devised a standard of review that balances the deference owed to prison administrators and the constitutional rights of prisoners: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *accord Thornburgh,* 490 U.S. at 409, 109 S.Ct. at 1879.

To accomplish the delicate balance in cases like this one, the *Turner* Court developed a four-part analysis to determine whether a prison regulation violates prisoners' rights under the First Amendment. First, "the governmental objective underlying the regulations ... [must be] legitimate and neutral, and [ ] the regulations [must be] rationally related to that objective." *Thornburgh,* 490 U.S. at 414, 109 S.Ct. at 1882; *accord Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. "A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262; *accord Thornburgh,* 490 U.S. at 417, 109 S.Ct. at 1884.

Third, the Court must consider the impact that accommodation of the asserted right would have on guards, other inmates, and prison resources. *See Thornburgh,* 490 U.S. at 418, 109 S.Ct. at 1884; *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. "When accommodation of an asserted right will have a 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed decisions of corrections officials." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262; *accord Thornburgh,* 490 U.S. at 418, 109 S.Ct. at 1884.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.... [I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262 (emphasis added); *accord Thornburgh,* 490 U.S. at 418, 109 S.Ct. at 1884.

## 1. Legitimate Penological Interest

■ In *Turner,* the Supreme Court found that a Missouri law prohibiting inmate-to-inmate correspondence was reasonably related to legitimate security interests, e.g., prevent escape plans and limiting communication between gang members. 482 U.S. at 91, 107 S.Ct. at 2263. Similarly, the *Thornburgh* Court ruled that a regulation that gave prison authorities the discretion to bar publications deemed to be detrimental to security was legitimate. 490 U.S. at 415, 109 S.Ct. at 1882. The Supreme Court then found that the regulation was reasonably related to that interest because the fact that the warden had to assess the materials on a case-by-case basis ensured that only those materials that were likely to lead to violence or to intolerable disorder were excluded. *Id.* at 416–17, 109 S.Ct. at 1883.

In this case, New Jersey claims that the legitimate penological interest for N.J.S.A. 2C:47–10 is that it will enhance the rehabilitation of the inmates at the ADTC.[5] New Jersey argues that sexually oriented materials will retard the inmates' rehabilitation by interfering with the inmates' attempts to obtain sympathy for their victims, understanding of their deviant sexual arousals, and ability to connect intimately with others. New Jersey reiterates the opinions and explana-

---

**5.** The Court notes that New Jersey attempts to couch its interest as the security of the public in general. The oral arguments, however, made it clear that the interest in rehabilitation fostered the security of the public. Thus, although the

Court recognizes that rehabilitating pedophiles and incestuous fathers will protect the children of New Jersey, the "real" interest in this case is rehabilitation.

tions of their experts: (1) the materials may block victim empathy because inmates may objectify the individuals depicted in the publications only for their sexual appeal; (2) the materials may lead inmates to act out their masturbatory fantasies, which arose out of the materials; and (3) the materials may lead inmates to believe that intimacy can be achieved only through sex.

■ The fact that this case deals with rehabilitation, and not security, does not alter the analysis because rehabilitation is a legitimate penological interest. *See Procunier v. Martinez*, 416 U.S. 396, 413–14, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974) (stating that substantial governmental interests in administering prisons are security, order, and rehabilitation), *overruled on other grounds by Thornburgh*, 490 U.S. at 413–14, 109 S.Ct. at 1882. During oral arguments, plaintiffs' counsel conceded that rehabilitating pedophiles and those who engage in incestuous conduct was a legitimate penological interest.

Plaintiffs, however, strongly disagree with New Jersey on two points. First, plaintiffs assert that the task force's dismay at seeing nude photographs on walls of the inmates' cells, and not the purported interest of rehabilitation, motivated the enactment of the statute. They add that New Jersey should not be allowed to proffer a post-hoc justification for the statute. Second, they argue that the purported interest is not reasonably related to the statute because experts disagree on whether sexually oriented materials facilitate or retard a pedophile's or incestuous father's rehabilitation.

### a. Post–Hoc Justification

■ To establish that a legitimate penological interest supports a statute, a state must provide evidence that the interest it proffered is the actual basis for the statute. *See Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir.1993) (finding that Arizona Department of Corrections submitted sufficient evidence to support its policy prohibiting physical contact between lawyers and inmates); *Swift v. Lewis*, 901 F.2d 730, 731 (9th Cir.1990) (reversing summary judgment for Arizona Department of Corrections because, *inter alia*, they did not provide evidence to show that

purported interests actually motivated grooming policy). If states and prison officials were not required to produce such evidence, "judicial review of prison policies would not be meaningful." *Swift*, 901 F.2d at 732.

New Jersey has failed to produce any evidence that rehabilitation, and not outrage, motivated the enactment of N.J.S.A. 2C:47–10. Nothing in the legislative history indicates that the legislators discussed or considered rehabilitation to be the reason for passing the statute. In addition, Graffin, the Director of Psychology at the ATDC, did not testify before either the Assembly or Senate. In fact, she conceded that she did not learn about the statute until May of this year. Finally, the DOC formally stated its opposition against the statute when Governor Whitman was considering it. Thus, it is likely that plaintiffs will be able to show that rehabilitation is not the interest supporting N.J.S.A. 2C:47–10, and that N.J.S.A. 2C:47–10 was an "exaggerated response" to the task force's visit of the ADTC.

The Court notes that the general rule of deference for prison officials does not seem to apply to this case for three reasons. First, both *Turner*, 482 U.S. at 85, 89, 107 S.Ct. at 2259, 2261–62, and *Thornburgh*, 490 U.S. at 407–08, 409, 109 S.Ct. at 1878–79, discussed deferring to prison authorities, not state legislators. For example, the *Turner* Court explained its reason for establishing the reasonable relationship test: "In our view, such a standard is necessary 'if prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional problems.'" 482 U.S. at 89, 107 S.Ct. at 2261–62 (quoting *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). This case, on the other hand, deals with state legislators, and not prison authorities.

Second, the Court might be inclined to defer to the legislators if they had passed N.J.S.A. 2C:47–10 because the administrators at the ADTC and/or DOC lobbied for or supported it. However, as stated *supra*, not only was such support lacking, but the DOC

actually opposed the statute. Third, when plaintiffs successfully show that legislators or prison "officials have exaggerated their response, the rule of deference loses its force and the district court must determine on the record whether the prison officials have indeed shown that the restrictive regulation is justified." *Hill v. Blackwell,* 774 F.2d 338, 343 (8th Cir.1985) (reversing district court's finding that defendants had not sufficiently justified their policy against beards). As stated *supra,* the Court, at this point in the proceedings, is inclined to find that the legislature overreacted.

### b. Reasonable Relationship

To establish a reasonable relationship, a state must have a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90, 107 S.Ct. at 2262. In *Thornburgh,* the Supreme Court found a reasonable relationship because the regulation was content neutral and provided for case-by-case analysis of materials. "We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." 490 U.S. at 415, 109 S.Ct. at 1882 (finding regulation banning materials with potential for security problems to be content neutral in technical sense because they related to important or substantial governmental interest unrelated to suppression of expression) (quoting *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262). The *Thornburgh* Court then addressed the regulation's requirement that no publication be excluded unless the warden determined that it was detrimental to prison security, good order, or discipline: "We are comforted by the individualized nature of the determinations required by the regulation." *Id.* at 416, 109 S.Ct. at 1883; *see also Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir.1978) (ruling that prison administrators had to review each sexually explicit material to determine whether it would encourage homosexuality, which was then criminal behavior).

The Court finds that plaintiffs would likely be able to show that no reasonable relationship exists between N.J.S.A. 2C:47–10 and rehabilitation for four reasons. First, the statute does not operate in a neutral fashion because it bans all materials that depict "sexual activity or associated anatomical areas." When regulations are content-based, courts must examine the relationship and the asserted justification more closely. *See Stefanow v. McFadden,* 103 F.3d 1466, 1472 (9th Cir.1996).

Second, as the Deputy Attorney General stated during oral argument, N.J.S.A. 2C:47–10 bans all sexually oriented materials because the burden on therapists to review each publication would be too onerous. *See* discussion on burden *infra* at Part II.A.3. Thus, this Court will receive no solace from the ADTC's failure to perform case-by-case determinations of the allegedly harmful materials.

Third and perhaps most importantly, the experts disagree on the impact of the materials. Plaintiffs' experts state that the therapists should examine the materials on a case-by-case basis to determine whether they will positively, adversely, or not affect an inmate's therapy. Defendants' experts argue that the materials are detrimental to all the inmates. Although the Court will refrain in this proceeding from assessing and weighing the experts' affidavits, it notes that the fact of disagreement itself bolsters plaintiffs' likelihood of success. Clearly, if the Court is unable to determine that the materials will have a negative impact on the inmates' rehabilitation, then the interest will not be reasonably related to the statute.

Fourth, during oral arguments, the Deputy Attorney General stated that the Legislature intended the statute to be applied realistically, and that the "Little Mermaid" and the Bible would be permitted into the ADTC. He then conceded that he did not know whether *National Geographic* would be allowed into the ADTC, and that the administrators would have to decide. However, how does one decide whether to disallow or permit inmates to read newspapers or magazines that contain sexually oriented advertisements? Con-

cededly, one administrator might allow such materials whereas another might not. The fact remains that therapists, and not administrators, should be the ones making the determinations of whether materials are permissible or detrimental. As will be discussed more thoroughly in Part II.B., the amount of discretion that New Jersey seeks to place in the hands of its administrators would certainly lead to inconsistent results and arbitrary decisions. Thus, it is likely that plaintiffs' would prevail in showing that the penological interest is not rationally related to rehabilitation.

### 2. Alternative Means

In *Thornburgh,* the Supreme Court found that alternative means existed because the regulation permitted the inmates to send, receive, and read a broad range of publications. 490 U.S. at 418, 109 S.Ct. at 1884. Here, New Jersey contends that N.J.S.A. 2C:47–10 easily satisfies the alternative means requirement because inmates are being deprived of only sexually oriented materials. Plaintiffs counter that no alternative means exist because the language of the statute is so broad that almost any publication could be banned from the ADTC.

As will be seen in Part II.B., the Court finds that the statute's broad scope implicitly eliminates too many of the inmates' outlets to free speech.

### 3. Impact of Accommodation and Alternatives

As stated in *Turner,* the third factor requires courts to be concerned about the ripple effect that accommodating the inmates will have on other inmates and prison officials. Finally, courts must consider whether an alternative to the regulation can be provided at *de minimis* cost. The Court will consider the third and fourth factors simultaneously because plaintiffs' and New Jersey's arguments on these factors overlap.

Defendants contend that accommodating plaintiffs' rights would create an onerous burden on the therapists at the ADTC because they would have to review each incoming material. They add that in reviewing the materials, the therapists would lose time from their primary responsibility of counsel-

ing inmates. Plaintiffs argue that those arguments are meritless because New Jersey has not presented any evidence that individualized screening would create an undue burden on the therapists. They contend that the therapists could review materials and determine their impact at a *de minimis* cost because they are familiar with the inmates and because they have been conducting such reviews for years.

■ "[W]here conditions within a prison facility are challenged as constitutionally inadequate, courts have been reluctant to consider cost to the institution a major factor in determining whether a constitutional violation exists." *Monmouth County Correctional Institution Inmates v. Lanzaro,* 834 F.2d 326, 336 (3d Cir.1987) (finding that purported administrative and economic considerations did not justify county's policy of denying inmates access to and funding for elective abortions). However, although "economic factors may become central to fashioning an affirmative remedy for demonstrated constitutional inadequacies, such considerations ordinarily cannot justify imposition of a restrictive regulation that infringes on a constitutional right." *Id.* at 337.

New Jersey's arguments fail for two reasons. First, their argument is tantamount to "we don't have enough psychologists." The Third Circuit's discussion on economic resources clearly states that such an argument is not really relevant when considering whether a regulation or statute violates a plaintiff's constitutional right. Second, at this stage, plaintiffs have to show only that their rights could be accommodated without causing a ripple effect on other inmates or prison officials. New Jersey has not provided the Court with any evidence that the psychologists could not review the materials without impeding their primary tasks of counseling inmates. Therefore, these factors also weigh in plaintiffs' favor.

### B. Overbroad

■ "Only a statute that is substantially overbroad may be invalidated on its face." *City of Houston, Texas v. Hill,* 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987). "In a facial challenge to the over-

breadth ... of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted). To determine that a law is overbroad, a court must find that "(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory way of severing the law's constitutional from its unconstitutional applications so as to excise the latter clearly in a single step from the law's reach." Laurence H. Tribe, American Constitutional Law § 12–27, at 1022 (2d ed.1988). These principles also apply to the prison context. *See Turner,* 482 U.S. at 98, 107 S.Ct. at 2266 (finding that Missouri's prohibition on inmates marrying other inmates and regular citizens swept too broadly because it required wardens to deny inmates permission to marry unless compelling interest existed).

Plaintiffs contend that the language of N.J.S.A. 2C:47–10 would ban many legitimate materials. They add that many of the materials that would be banned have no relation to rehabilitation. In particular, they argue that the statute will interfere with their right of access to the courts because it bans them from reading legal opinions that contain accounts of sexual activity.

The Court finds that the language of N.J.S.A. 2C:47–10 is probably overbroad because it could potentially prohibit the inmates from reading or viewing many legitimate publications. The language that troubles the Court is the definition of sexually oriented material: "[A]ny description, narrative account display, or depiction of sexual activity or associated anatomical area contained in, or consisting of, a picture or other representation, publication, sound recording, live performance, or film." Two problems arise from that definition. First, the word "any" ensures that the statute is overbroad because "any" mandates that no exceptions will be made to the statute. Second, "any associated anatomical area" appears to mean that every publication that contains a body part that is associated with sexual activity is banned. Thus, the Court

agrees with plaintiffs' argument that the statute prohibits them from reading the Bible, fashion magazines, books, and cases.

New Jersey's rebuttal that the statute will be enforced realistically, and that the administrators of the ADTC have not confiscated any inmate's Bible is unavailing because the enforcement of the statute does not cure the statute's sweeping language. The plain language of N.J.S.A. 2C:47–10 mandates that certain, every day literature would be banned from the ATDC. For example, on June 19, 1998, the *New York Times* ran a story about the frankness, boldness, vulgarity, and tastefulness of today's advertisements. Stuart Elliot, *The New York Times,* "A Vivid Livid Divide," June 18, 1998, at D1. Under the language of the statute, the article and the advertisements it discussed would have to be excluded because the article is about sexually explicit advertisements. Therefore, the Court finds that plaintiffs would probably prevail on the issue of overbreadth.

### C. Vagueness

"As a matter of due process, a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" Tribe, *supra,* § 12–31, at 1033 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). Vague statutes violate the Due Process Clause because they do not give people fair notice of what conduct violates the statute and because they give law enforcement officials too much discretion. *See id.* (citations omitted). Moreover, in the First Amendment context, vague statutes have a chilling effect. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 117 S.Ct. 2329, 2344, 138 L.Ed.2d 874 (1997); Tribe, *supra,* § 12–31, at 1034. "Those ... sensitive to the perils posed by ... indefinite language, avoid the risk only by restricting their conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Baggett v. Bullitt,* 377 U.S. 360, 372–73, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964) (citations omitted).

This Court agrees with plaintiffs that N.J.S.A. 2C:47–10's failure to define "associ-

ated anatomical area" probably renders the statute void for vagueness. Common sense suggests that sexual activity includes everything from kissing to intercourse. However, banning publications that contain two adults kissing would be absurd. The Deputy Attorney General conceded as much during oral argument when he stated that the statute was not intended to ban kisses like the one in "The Little Mermaid." Moreover, what anatomical areas are associated with sexual activity? For example, when the Court asked whether an advertisement with a woman's leg sticking out of a bathtub would be permitted into the ADTC, the Deputy Attorney General could not answer the question definitively, but said that the statute would be enforced realistically. Likewise, when confronted with bare-breasted women in *National Geographic,* he said that the administrators would have to decide. Thus, the Court finds that plaintiffs would probably prevail because N.J.S.A. 2C:47–10 appears to be void for vagueness.

### III. Irreparable Harm

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 91 (3d Cir.1992). Moreover, a plaintiff must make a clear showing that irreparable harm will occur immediately. *See ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987).

In the constitutional setting, "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable harm." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547, (1976). However, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir.) (finding no irreparable injury where plaintiffs' remedy was restitution and/or monetary damages), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). To meet their burden, "plaintiffs must show a chilling effect on free expression." *Id.* (quotation omitted); *see also McCormack v. Township of Clinton,* 872 F.Supp. 1320, 1327 (D.N.J.1994) (finding irreparable injury where local ordinance threatened criminal sanctions); *Lysaght v. New Jersey,* 837 F.Supp. 646 (D.N.J.1993) (ruling that threat of criminal prosecutions under statute is irreparable harm because they would chill plaintiffs' speech). In essence, irreparable harm for preliminary injunction purposes is shown when the government purposefully and unconstitutionally suppresses speech. *Hohe,* 868 F.2d at 73. Accordingly, "it is the direct penalization, as opposed to incidental inhibition, of First Amendment rights which constitutes irreparable injury." *Id.* (quotation omitted).

Here, subsection (c) of N.J.S.A. 2C:47–10 states that inmates who violate the statute will be subject to on-the-spot sanctions. Plaintiffs argue that such sanctions will have a chilling effect on their rights under the First Amendment. New Jersey counters that the sanctions do not establish irreparable injury because they could be remedied. During oral arguments, the Deputy Attorney General stated that the sanctions included losing recreation time and visits. He stated that the loss of recreation did not constitute irreparable harm because inmates do not have a constitutional right to it.

The Court finds that if it did not issue a preliminary injunction, plaintiffs would be irreparably harmed because the threat of sanctions would chill their constitutional right to free speech. The Court disagrees with New Jersey's position on the sanctions because the issue is not whether the sanction deprives someone of a constitutional right, but whether a penalty exists that will have a chilling effect on rights under the First Amendment. N.J.S.A. 2C:47–10(c) calls for on-the-spot sanctions if an inmate violates the statute. Those sanctions are of sufficient magnitude to chill plaintiffs' speech. Thus, plaintiffs have established irreparable injury.

### IV. New Jersey's and the Public's Interests

Plaintiffs assert that New Jersey will suffer no irreparable harm if the injunc-

tion is issued because the legislative history does not reveal what, if any, harm New Jersey is currently suffering. They also contend that the public interest weighs in their favor because the public is concerned about rights under the First Amendment. New Jersey counters that it will suffer irreparable harm because an injunction will hinder plaintiffs' rehabilitation, thereby interfering with its ability to run its prison system. New Jersey invokes a similar argument for the public's interest. It argues that the public is concerned that the inmates of its prisons are rehabilitated so that they can become valuable members of society.

Although this Court agrees with the premise of New Jersey's arguments, the Court finds that they are not persuasive in this context because as stated *supra*, the record is inconclusive on whether sexually oriented materials are detrimental to sex offenders' rehabilitation. Moreover, the depiction of sexually oriented material has been permitted since 1976 with no documented harm. Thus, the Court finds that an injunction would serve little to no harm to New Jersey. Furthermore, the public cannot have an interest in rehabilitation that may be ineffective.

### CONCLUSION

The Court will preliminarily enjoin New Jersey from enforcing N.J.S.A. 2C:47–10 because each of the four considerations weigh in plaintiffs' favor. Although the Court could probably enter a permanent injunction against New Jersey because of the findings that the statute is overbroad and vague, the Court will refrain from doing so for two reasons. First, the issue of what impact sexually oriented materials have on the rehabilitation of sex offenders remains open. Second, the Court believes that New Jersey should have another opportunity to address the issues of overbreadth and vagueness. The Court will grant this opportunity notwithstanding the fact that New Jersey's burden on these two issues appears to be insurmountable given the Court's analysis and the static nature of N.J.S.A. 2C:47–10's language.

The Court notes that New Jersey's purported interest is compelling because the public certainly has an interest in rehabilitating its prisoners, especially pedophiles and incestuous fathers. Moreover, how to rehabilitate prisoners, like other prison decisions, is generally left to prison administrators. In this case, however, the record does not support New Jersey's purported interest. Thus, the Court is unable, as the statute is currently drafted, to defer to the expertise of the prison administrators, and will require New Jersey and plaintiffs to provide evidence in open court on how the materials at issue affect the rehabilitation of the inmates at the ADTC.

Today, the Court will vacate the temporary restraining order and enter a preliminary injunction. To determine whether the preliminary injunction should become a permanent injunction, the Court will conduct an evidentiary trial on short notice. At that time, the Court will determine the constitutionality of this statute.