United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 8, 1998 Decided September 15, 1998 

 No. 97-5293

 Joseph Amatel, et al., 

 Appellees

 v.

 Janet Reno, Attorney General of the United States, et al., 

 Appellants

 Consolidated with

 Nos. 97-5294, 97-5295

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 96cv02774) 

 (No. 96cv02790) 

 (No. 97cv00475)

 Edward Himmelfarb, Attorney, U.S. Department of Jus-
tice, argued the cause for appellants. With him on the briefs 

were Frank W. Hunger, Assistant Attorney General, Wilma 
A. Lewis, U.S. Attorney, and Barbara L. Herwig, Assistant 
Director, U.S. Department of Justice.

 Jodie L. Kelley argued the cause for appellees. With her 
on the brief were Ann M. Kappler, Marjorie Rifkin and 
Margaret Winter.

 Bruce A. Taylor was on the brief for amici curiae National 
Coalition for the Protection of Children & Families, et al.

 Before: Wald, Williams and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Dissenting opinion filed by Circuit Judge Wald.

 Williams, Circuit Judge: A group of prisoners and publish-
ers challenges the constitutionality of a statutory ban on the 
use of Bureau of Prisons funds to distribute sexually explicit 
material to prisoners. The statute is not enforced directly; 
instead, the Bureau has promulgated regulations defining the 
terms of the proscription and significantly narrowing its 
scope. The district court, analyzing the statute, ruled that it 
was facially invalid as a violation of the First Amendment and 
enjoined its enforcement. Finding that scrutiny should be 
directed to the substance of the regulations instead, and 
disagreeing with the district court's evaluation, we reverse 
and remand.

 
 * * *

 Before 1996, federal regulations authorized prison wardens 
to reject a publication "only if it [was] determined detrimental 
to the security, good order, or discipline of the institution or if 
it might facilitate criminal activity." 28 CFR s 540.71(b). 
Sexually explicit material fell into this category if it "by its 
nature or content pose[d] a threat to the security, good order, 
or discipline of the institution, or facilitate[d] criminal activi-
ty." 28 CFR s 540.71(b)(7). Under this standard, explicit 
heterosexual material was ordinarily admitted. See Thorn-
burgh v. Abbott, 490 U.S. 401, 405 n.6 (1989).

 In 1996 Congress passed the Ensign Amendment, which 
bars the use of Bureau of Prisons funds to pay for the 
distribution of commercial material that "is sexually explicit 
or features nudity." 1 See Omnibus Consolidated Appropria-
tions Act of 1997, Pub. L. No. 104-208 s 614.2 Regulations 
later adopted by the Bureau assign rather narrow meanings 
to these terms: "nudity" means "a pictorial depiction where 
genitalia or female breasts are exposed"; "features" means 
that "the publication contains depictions of nudity or sexually 
explicit conduct on a routine or regular basis or promotes 
itself based upon such depictions in the case of individual one-
time issues." Even material that otherwise would be said to 
"feature nudity" is excepted if it contains "nudity illustrative 
of medical, educational, or anthropological content." "Sexual-
ly explicit" means "a pictorial depiction of actual or simulated 
sexual acts including sexual intercourse, oral sex, or mastur-
bation." 28 CFR s 540.72(b). Under these regulations, then, 
there is no restriction whatever on non-pictorial sexually 
explicit material.

 In 1997, three inmates, each denied receipt of either Play-
boy or Penthouse, filed separate suits alleging that the En-
sign Amendment violated the First Amendment. Their suits 
were consolidated, along with similar suits filed by the pub-
lishers of those magazines and a publishing trade organiza-
tion; the consolidated plaintiffs moved for injunctive relief. 
The district court, purporting to apply the test set out in 
Turner v. Safley, 482 U.S. 78 (1987), found the Ensign 
Amendment facially invalid--implicitly granting plaintiffs' 

__________
 1 By its terms, the statute therefore does not prohibit prisoners 
from obtaining such material at their own expense. Neither party 
has suggested that this is a realistic possibility, or discussed the 
rules governing gifts by visitors. Accordingly, our analysis will 
treat the spending restriction as a ban on distribution. Where the 
government absolutely monopolizes the means of speech or controls 
a bottleneck, as we are assuming vis-a-vis the prison distribution 
system, a refusal to fund functions the same as an outright ban.

 2 Identical language appears in s 614 of Pub. L. No. 105-119, 
governing the fiscal year ending September 30, 1998, so no issue of 
mootness is currently posed.

motion for summary judgment (which, in fact, they never 
made)--and permanently enjoined its enforcement.

 

 * * *

 Both sides agree that Safley sets out the appropriate 
framework for reviewing government regulation of prisons.3 
But before beginning that analysis, we must note that our 
first difference with the district court is as to the proper 
object of judicial scrutiny.

 Plaintiffs ask for relief against both the Ensign Amend-
ment and its implementing regulations. The district court 
seemed to assume that the statute itself has been and will be 
applied to these plaintiffs; accordingly, it directed its analysis 
primarily towards the statute. But there is no suggestion 
that any warden does or will apply the statute directly; so far 
as appears, all enforcement is mediated through the regula-
tions.

 Insofar as plaintiffs attack the proscriptions of the statute 
not embodied in the regulations, they effectively pursue a 
pre-enforcement challenge. Even in the First Amendment 
context, such a challenge presents a justiciable controversy 
only if the probability of enforcement is "real and substan-
tial." Salvation Army v. Dep't of Comm. Affairs, 919 F.2d 
183, 192 (3d Cir. 1990); see also Steffel v. Thompson, 415 U.S. 
452, 460 (1974). In the statutory borderland beyond the 
implementing regulations (i.e., the statute's apparent ban on 
some non-pictorial material, its vaguer language, and its lack 
of any exception for medical or educational material), the 
prospect of enforcement appears completely insubstantial. It 
is as if the government had waived certain provisions of the 
law. And with such a waiver, as Salvation Army explicitly 
holds, there is no standing to challenge the waived provisions. 
See 919 F.2d at 192-93 ("[T]he district court should decline to 

__________
 3 The claims of the publisher plaintiffs might seem to call for a 
different analysis, as they of course are not prisoners. Thornburgh 
makes clear, however, that Safley's reasonableness standard gov-
erns "regulations that affect[ ] rights of prisoners and outsiders." 
490 U.S. at 410 n.9.

provide an advisory opinion regarding the constitutionality of 
these provisions."). See also Forsyth County, Georgia v. 
Nationalist Movement, 505 U.S. 123, 131 (1992) (evaluation of 
facial challenge to statute must take into account construction 
by enforcing body). We therefore limit our focus to the 
substantive prohibitions of the regulations.4

 

 * * *

 Cases analyzing constitutional claims by those within gov-
ernmental institutions such as prisons, public schools, the 
military, or the government workplace often open with the 
axiom that the boundaries of those institutions do not sepa-
rate inhabitants from their constitutional rights. See, e.g., 
Safley, 482 U.S. at 84 ("Prison walls do not form a barrier 
separating prison inmates from the protections of the Consti-
tution."); Connick v. Myers, 461 U.S. 138, 142 (1983) ("[I]t 
has been settled that a State cannot condition public employ-
ment on a basis that infringes the employee's constitutionally 
protected interest in freedom of expression."); Tinker v. Des 
Moines Independent Community School Dist., 393 U.S. 503, 
506 (1969) ("It can hardly be argued that either students or 
teachers shed their constitutional rights to freedom of speech 
or expression at the schoolhouse gate."); General Media 
Communications, Inc. v. Cohen, ("GMC ") 131 F.3d 273, 276 
(2d Cir. 1997) ("The Constitution does not, of course, stop at 
the gates of a military base."). This observation is invariably 
followed by the complementary principle that by their nature 
such environments must allow regulation more intrusive than 
what may lawfully apply to the general public. See Safley, 
482 U.S. at 84-85; Connick, 461 U.S. at 143; Tinker, 393 U.S. 
at 507; GMC, 131 F.3d at 276. In these environments, the 
government is permitted to balance constitutional rights 

__________
 4 Our dissenting colleague relies on two recent decisions invalidat-
ing provisions that are more similar to the statute than to the 
regulatory intepretation established in this case. Mauro v. Arpaio, 
1998 WL 550190 (9th Cir. Sept. 1, 1998); Waterman v. Verniero, 
1998 WL 354932 (D.N.J. June 29, 1998). See Dissent at 1-2 n.1. 
Because we see the only ripe case before us as confined to the 
regulations, our case is plainly distinguishable.

against institutional efficiency in ways it may not ordinarily 
do.5 See, e.g., Waters v. Churchill, 511 U.S. 661, 675 (1994) 
(describing governmental power to restrict speech in the 
name of efficiency); Safley, 482 U.S. at 88 (noting balancing 
between First Amendment rights and governmental inter-
ests).

 For the prison context, Safley directs courts to uphold a 
regulation, even one circumscribing constitutionally protected 
interests, so long as it "is reasonably related to legitimate 
penological interests." 482 U.S. at 89. We are to assess the 
overall reasonableness of such restrictions with attention to 
four factors: first, whether the restriction bears a "valid, 
rational connection" to the "legitimate governmental interest 
put forward to justify it," such that the "asserted goal is [not] 
so remote as to render the policy arbitrary or irrational," id. 
at 89-90; second, whether inmates retain alternative means 
of exercising the circumscribed right, id. at 90; third, the 
costs that accommodating the right imposes on other inmates, 
guards, and prison resources generally, id.; and fourth, 
whether there are alternatives to the regulation that "fully 
accommodate[ ] the prisoner's rights at de minimis cost to 
valid penological interests," id. at 90-91. Although the fac-
tors are intended as guides to a single reasonableness stan-
dard, see id. at 89; see also Thornburgh, 490 U.S. at 414 
("The Court in [Safley] identified several factors that are 
relevant to, and that serve to channel, the reasonableness 
inquiry."), the first factor looms especially large. Its rational-
ity inquiry tends to encompass the remaining factors, and 
some of its criteria are apparently necessary conditions. 
Nothing can save a regulation that promotes an illegitimate 
or non-neutral goal. See Safley, 482 U.S. at 90.

__________
 5 This distinction is often phrased in terms of differential stan-
dards of review applicable to the government when it acts in roles 
other than sovereign. See, e.g., Waters v. Churchill, 511 U.S. 661, 
671 (1994). But it may be more apt to conceive of it as a distinction 
between government regulation of public discourse generally, and 
government regulation of speech within governmental institutions. 
See generally Robert Post, Constitutional Domains 199-268 (1995).


 In this case, both proponents in congressional debate, and 
the government in its briefs here, assert as the goal an 
interest in the rehabilitation of prisoners. See, e.g., 142 
Cong. Rec. H8261 (daily ed. July 24, 1996) ("Congress 
should not be fueling the sexual appetites of offenders, espe-
cially those who have been convicted of despicable sex of-
fenses against women and children. Magazines that portray 
and exploit sex acts have no place in the rehabilitative envi-
ronment of prisons, nor should we pay Bureau of Prison[s] 
staff to distribute them.") (statement of Rep. Ensign); id. at 
H8262 ("The infamous serial killer Ted Bundy ... stated 
before his death his belief that pornographic materials direct-
ly contributed to his violent crimes. While a number of 
factors determine whether a prisoner will become a law-
abiding citizen upon release from prison, cutting prisoners off 
from their sexually explicit magazines will certainly do no 
harm.") (statement of Rep. Ensign). The next question is 
whether rehabilitation is a legitimate and "neutral" govern-
ment interest within the meaning of Safley.

 The legitimacy of the rehabilitative purpose appears indis-
putable. Indeed, the Supreme Court has often characterized 
rehabilitation as one of the primary goals of penal institu-
tions. See, e.g., O'Lone v. Estate of Shabazz, 482 U.S. 342, 
348 (1987) (describing rehabilitation as "valid penological 
objective[ ]"); Procunier v. Martinez, 416 U.S. 396, 413 (1974) 
(identifying "substantial government interests of security, 
order, and rehabilitation"). At least since the mid-19th cen-
tury, it is hard to imagine a prison system that did not seek 
to reduce the likelihood that prisoners would again transgress 
society's norms. The inventors of the prison in New York 
and Pennsylvania framed its goals in these terms:

 The penitentiary, free of corruptions and dedicated to 
 the proper training of the inmate, would inculcate the 
 discipline that negligent parents, evil companions, tav-
 erns, houses of prostitution, theaters, and gambling halls 
 had destroyed. Just as the criminal's environment had 
 led him into crime, the institutional environment would 
 lead him out of it.

David J. Rothman, The Invention of the Asylum: Social 
Order and Disorder in the New Republic 82-83 (rev. ed. 
1990).

 In turning to "neutrality," the district court looked at the 
statute itself, not the goal, and found it non-neutral. "[T]he 
Ensign Amendment is a content-based statute with a sole 
focus on the sexual nature of the publications it seeks to 
prohibit." The conclusion is correct--the Ensign Amendment 
is formulated in terms of content. But we do not understand 
that characteristic to run afoul of Safley's neutrality require-
ment. Despite the apparent similarity in terms, "neutrality" 
in the Safley sense is quite different from the familiar First 
Amendment notion of "content-neutrality." The Court most 
recently explained in Thornburgh that "neutral" here means 
no more than that "the regulation or practice in question 
must further an important or substantial governmental inter-
est unrelated to the suppression of expression." 490 U.S. at 
415 (quoting Martinez). There the Court found neutrality 
simply because in application of the regulations the prison 
administrators were to "draw distinctions between publica-
tions solely on the basis of their potential implications for 
prison security." Id. It pointed out that the regulations 
struck down in Martinez, in contrast, barred writings that 
"unduly complain[ed]" or "magnif[ied] grievances," or ex-
pressed "inflammatory" views, thus inviting the prison au-
thorities " 'to apply their own personal prejudices and opin-
ions as standards for prisoner mail censorship.' " 490 U.S. at 
416 n.14 (quoting Martinez); see also Martinez, 416 U.S. at 
415 (striking down regulations because no legitimate interest 
at all was offered as justification). Thus the Martinez regula-
tions were "decidedly not 'neutral' in the relevant sense." 
Thornburgh, 490 U.S. at 416 n.14.

 The rehabilitative interest offered by the government here 
meets this rather thin neutrality requirement. The Court 
cannot have meant to insist upon neutrality in its classic First 
Amendment sense, as embodied, for example, in the dictum of 
Gertz v. Robert Welch, Inc., 418 U.S. 323, 339 (1974), that 
"[u]nder the First Amendment, there is no such thing as a 
false idea." In its role as an operator of prisons, the govern-
ment surely does not lapse from the required neutrality if it 
bans "how-to" manuals on fraud and embezzlement ("Fraud 
for Dummies"). The idea that committing such crimes is not 


proper may not be "false" in the Gertz sense, but in the 
prison context the government may oppose it rather absolute-
ly. This authority cannot be explained away on the theory 
that such a ban could withstand even the strictest scrutiny 
and that its validity therefore tells us nothing of the "neutrali-
ty" requirement; as voiced by the Court, the "neutrality" 
requirement is an absolute prerequisite. Accordingly, we 
think the Court's actual application of the requirement, with 
its focus on the existence of some legitimate goal and on 
assuring that rules are in fact not framed so as to advance 
illegitimate or unvetted goals, must control our understanding 
of its meaning.

 That government power to inculcate values conflicts with 
the libertarian premises of the First Amendment is clear, but 
such power is well established. Even outside special govern-
mental institutions, the state has some authority to become a 
player in the marketplace of ideas. It may commission 
advertising urging children to stay in school or off drugs; it 
can sponsor anti-violence campaigns. See Regan v. Taxation 
with Representation, 461 U.S. 540, 548-59 (1983); see gener-
ally Rust v. Sullivan, 500 U.S. 173, 193 (1991) ("The Govern-
ment can, without violating the Constitution, selectively fund 
a program to encourage certain activities it believes to be in 
the public interest, without at the same time funding an 
alternate program which seeks to deal with the problem in 
another way.").

 And within its own institutions, government's power to 
pursue its legitimate goals is elevated: within reasonable 
limits, it may attach sanctions to or exclude speech that 
threatens its goals--even if those goals include promotion of 
particular values. That is the general lesson of cases such as 
Waters, 511 U.S. 661 (upholding dismissal of employee for 
speech that might have caused disruption); Bethel School 
Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (upholding 
suspension of student who used indecent language in assem-
bly speech); and Greer v. Spock, 424 U.S. 828 (1976) (uphold-
ing exclusion from military base of civilians who wished to 
distribute political literature).


 Of course this does not mean by a long shot that every 
government institution can pursue any value. Our century 
has seen more than enough of governments trying to act as 
engineers of human souls. But inculcation of values cannot 
be characterized as a suppression of expression in every 
context. The Supreme Court has in fact taken the position 
that democratic society depends on inculcation of democratic 
values. See, e.g., Ambach v. Norwick, 441 U.S. 68, 76-77 
(1979) (stating that public schools are important "in the 
preparation of individuals for participation as citizens, and in 
the preservation of the values on which our society rests"); 
Brown v. Board of Education, 347 U.S. 483, 493, (1954) 
("[Public education] is a principal instrument in awakening 
the child to cultural values, in preparing him for later profes-
sional training, and in helping him to adjust normally to his 
environment."). The generality of Safley's reasonableness 
test, and common sense as well, suggest that the flexibility 
open to the political branches must be at its apogee in 
institutions for the care and custody of those who have 
already transgressed society's norms. If "promoting respect 
for authority and traditional values" among schoolchildren is 
a legitimate interest of government and not inherently a form 
of speech suppression, see Board of Education, Island Trees 
Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 864 
(1982) (plurality opinion), surely the same is true of promot-
ing such a goal among criminals.

 Prisoners of course differ from the other examples of 
individuals entangled with the government in that they have 
no recourse to a private sphere. For them, there is no 
outside. Judges plainly must bear in mind the total occupa-
tion of prisoners' lives by the state. But prisoners find 
themselves in the maw of the state not because they have 
been drawn there by the promise of government wages, nor 
because a statute imposes a universal requirement of edu-
cation, but because they have broken the law. Moreover, 
even government workers have suffered a similar eclipse of 
the private sphere; the government's ability to fire them for 
speech that threatens workplace disruption is not limited to 
speech within the workplace. See, e.g., Pickering v. Board of 


Education, 391 U.S. 563 (1968) (analyzing letter to the edi-
tor). See generally Note, The Costs of Agencies: Waters v. 
Churchill and the First Amendment in the Administrative 
State, 106 Yale L.J. 1233, 1239-40 (1997) (discussing scope of 
governmental authority). Accordingly, we conclude that re-
habilitation, and such character-moulding as may be implicit 
therein, constitute legitimate and neutral goals as those are 
understood in Safley.

 

 * * *

 We thus turn to whether there is a "valid rational connec-
tion" between the interest and the regulations. Prison juris-
prudence is not well enough developed to indicate precisely 
how demanding the requirement of rational means-end con-
nection is. But the similarity between Safley's phrasing and 
the language of rational basis review suggests to us that, as 
far as the means-end fit is concerned, Safley's standard is, if 
not identical, something very similar. Compare, e.g., Nord-
linger v. Hahn, 505 U.S. 1, 11 (1992) ("[T]he relationship of 
the classification to its goal is not so attenuated as to render 
the distinction arbitrary or irrational.") with Safley, 482 U.S. 
at 89-90 ("[T]he logical connection between the regulation 
and the asserted goal is so remote as to render the policy 
arbitrary or irrational.").

 The legislative judgment is that pornography adversely 
affects rehabilitation. It does not matter whether we agree 
with the legislature, only whether we find its judgment 
rational. The question for us is not whether the regulation in 
fact advances the government interest, only whether the 
legislature might reasonably have thought that it would. See, 
e.g., Nordlinger, 505 U.S. at 11.

 We think that the government could rationally have seen a 
connection between pornography and rehabilitative values. 
Congress might well perceive pornography as tending gener-
ally to thwart the character growth of its consumers. One 
current exposition of this view sees pornography as treating 
women purely as objects of male sexual gratification. See, 
e.g., Catharine A. MacKinnon, Only Words 108-10; Mac-

Kinnon, "Francis Biddle's Sister: Pornography, Civil Rights, 
and Speech," in Feminism Unmodified 163, 174 (1987); Mar-
tha C. Nussbaum, "Objectification," 25 Phil. & Pub. Affairs 
249, 283-86 (1995); Cass Sunstein, The Partial Constitution 
257-90 (1993). But this viewpoint shares at least a core with 
ideas that have a lineage of a few centuries, perhaps millen-
nia, stressing the desirability of deferring gratification, of 
sublimation of sexual impulses, of channeling sexual expres-
sion into long-term relationships of caring and affection, of 
joining eros to agape. The supposition that exclusion of 
pornography from prisons will have much of an impact in this 
direction may be optimistic, but it is not irrational.

 There is, of course, no "record evidence," and certainly no 
sophisticated multiple regression analyses or other social 
science data, to support this belief--a fact our dissenting 
colleague finds fatal. See Dissent at 8-11. We do not think, 
however, that common sense must be the mere handmaiden 
of social science data or expert testimonials in evaluating 
congressional judgments. Quite the opposite: scientific stud-
ies can have a corrective effect by establishing an apparently 
implausible connection or refuting an apparently obvious one, 
but, subject to such corrections, conformity to commonsensi-
cal intuitive judgments is a standard element of both reason-
ableness and rationality. Compare D.N. McCloskey, The 
Rhetoric of Economics 44 (1985) ("Not all regression analyses 
are more persuasive than all moral arguments; not all con-
trolled experiments are more persuasive than all introspec-
tions. People should not discriminate against propositions on 
the basis of epistemological origin. There are some subjec-
tive, soft, vague propositions that are more persuasive than 
some objective, hard, precise propositions.") Nor do we think 
Safley requires more. In that case, the Court scoured the 
record for evidence of a rational link between the asserted 
security interests and the marriage ban because common 
sense does not suggest any. See Safley, 482 U.S. at 97-100. 
Here, the regulations restrict prison consumption of publica-
tions that implicitly elevate the value of the viewer's immedi-
ate sexual gratification over the values of respect and consid-
eration for others. Common sense tells us that prisoners are 


more likely to develop the now-missing self-control and re-
spect for others if prevented from poring over pictures that 
are themselves degrading and disrespectful.

 Nor can we find irrationality in a congressional fear that 
pornography may set back rehabilitation in the narrower 
sense, more directly related to recidivist activity. The briefs, 
particularly that of the amicus curiae, call our attention to 
studies purporting either to document or to demolish the 
causal link between pornography and sex crimes.6 Without 
attempting a comprehensive summary, we note a few. One 
concludes that exposing "already angered men" (probably not 
especially rare in prison) to nonviolent pornography can lead 
to short-term increases in their aggressiveness. Edward 
Donnerstein, et al., The Question of Pornography 40-48 
(1987). Another finds that "pornography provides ideational 
support for rape...." Larry Baron & Murray A. Straus, 
Four Theories of Rape in American Society 185 (1989). 
Baron & Straus's primary evidence for this claim is an 
observed correlation between the circulation rates of sex 
magazines and reported rape rates. While they are hesitant 
to defend a "cause-effect" link between pornography and 
rape, they do see the correlation as explained by "the pres-
ence of a hypermasculine or macho culture pattern." Id. at 
186. This cultural pattern, Baron and Straus hypothesize, 
causes both higher incidence of rape and higher consumption 
of pornography. Of course, it seems quite likely that a 
culture and its manifestations have a mutually reinforcing 
relationship, so that a prohibition of pornography is a reason-
able element of a struggle against machismo and its ill effects.

 Finally, there is a significant body of research showing 
that long-term exposure to pornography, particularly pornog-

__________
 6 Congress did not cite these materials, an omission of no impor-
tance. See Jones v. United States, 463 U.S. 354, 365 n.13 (1983). 
Our concern is not why Congress believed that pornography affect-
ed rehabilitation, but whether it would have been rational so to 
believe. Cf. Turner Broadcasting System, Inc. v. FCC, 117 S. Ct. 
1174, 1197 (1997) ("Congress is not obligated, when enacting its 
statutes, to make a record of the type that an administrative agency 
or court does to accommodate judicial review.").

raphy containing scenes of "aggressive sexuality," can make 
its (male) audience more aggressive, more tolerant of violence 
against women, and more susceptible to myths about rape, 
such as the notion that women can enjoy being raped. See 
Neil Malamuth, "Aggression against Women: Cultural and 
Individual Causes," in Malamuth & Donnerstein, 19, 32-39; 
see also Mike Allen et al., "Exposure to Pornography and 
Acceptance of Rape Myths," 45 J. Communication 5 (1995) 
("Although the experimental studies demonstrate that violent 
pornography has more effect [inducing rape myth acceptance] 
than nonviolent pornography, nonviolent pornography still 
demonstrates an effect.") See also Richard A. Posner, Sex 
and Reason, 366-71 (1992) (noting inconclusiveness of social 
science findings on net effects of pornography on incidence of 
rape; pornography may tend to increase rape by its ideologi-
cal and aphrodisiac effects, but may tend to decrease it by 
enhancing a substitute (masturbation), the balance of these 
effects being unknown).

 The point of this is not to suggest that a causal link has 
been shown. The array of academic authority on the other 
side is at least as substantial, and quite possibly more so. 
But even undertaking to weigh the competing scholarship 
would misconceive the judicial role. Dealing with legislative 
judgments about rehabilitation, the Supreme Court has said 
that "[w]hen Congress undertakes to act in areas fraught 
with medical and scientific uncertainties, legislative options 
must be especially broad and courts should be cautious not to 
rewrite legislation, even assuming, arguendo, that judges with 
more direct exposure to the problem might make wiser 
choices." Marshall v. United States, 414 U.S. 417, 427 (1974) 
(emphasis in original); see also Kansas v. Hendricks, 117 S. 
Ct. 2072, 2081 n.3 (1997). And in upholding a statute barring 
provision of sexually explicit material to minors, the Court 
noted that "while these studies all agree that a causal link 
[between exposure to explicit material and impaired ethical 
and moral development] has not been demonstrated, they are 
equally agreed that a causal link has not been disproved 
either." Ginsberg v. New York, 390 U.S. 629, 642 (1968) 
(internal quotation omitted); see also American Booksellers 


Ass'n v. Hudnut, 771 F.2d 323, 329 n.3 (7th Cir. 1985). The 
same uncertainty prevails here, and suffices to place the 
legislative judgment within the realm of reason under the 
standards applicable to the political branches' management of 
prisons.

 The evidence is simply not conclusive on the efficacy of a 
ban on pornography in promoting prisoners' rehabilitation. 
For judges seeking only a reasonable connection between 
legislative goals and actions, scientific indeterminacy is deter-
minative.
 

 * * *

 The remaining Safley factors further substantiate the over-
all reasonableness of the regulations. The second involves 
the prisoners' alternative means of exercising the right at 
stake. Of course if the "right" at stake is defined in terms of 
the materials excluded by the ban, any regulation will come 
up short. The Court accordingly observed in Thornburgh 
that the relevant right "must be viewed sensibly and expan-
sively," 490 U.S. at 417, though it stated no method for 
actually carrying out the definitional process. In Thorn-
burgh, where the regulation barred all "sexually explicit 
material which by its nature or content poses a threat to the 
security, good order, or discipline of the institution, or facili-
tates criminal activity," id. at 405 n.5, the Court found the 
second factor "clearly satisfied" because "the regulations 
[there at issue] permit a broad range of publications to be 
sent, received, and read," id. at 418. In so doing, it made no 
inquiry into the scope of sexually explicit material not covered 
by the ban. Thus, unless there is some minimum entitlement 
to smut in prison, the origins of which must be obscure, this 
factor can hardly be fatal.7

 The third Safley factor concerns the adverse impact "on 
guards and other inmates, and on the allocation of prison 

__________
 7 Even if there were such a bizarre entitlement, the regulations 
would still satisfy this factor, as they leave the inmate free to enjoy 
all written forms of smut not barred by the regulations upheld in 
Thornburgh.

resources" of accommodating the right claimed. 482 U.S. at 
90. It thus seems in part a restatement of the deferential 
balancing called for under the first factor: if Congress may 
reasonably conclude that pornography increases the risk of 
prison rape, then the adverse impact is substantial. Accom-
modating the right poses a threat to the safety of guards and 
other inmates. The issue of the allocation of prison resources 
we take up below; we think the third and fourth factors are 
strongly interrelated.

 The fourth Safley factor poses the question whether there 
are alternatives that can accommodate that right "at de 
minimis costs to valid penological interests." Safley, 482 
U.S. at 91. This is not, the Court emphasized, a " 'least 
restrictive alternative' test." Id. at 90. The most obvious 
alternative is a detailed prisoner-by-prisoner (and presumably 
publication-by-publication) sifting to determine whether a 
particular publication will harm the rehabilitation of a particu-
lar prisoner. The costs of this approach seem far from de 
minimis. Apart from the purely administrative burden of 
such a process, the exercise of such broad discretion seems 
highly conducive to just the sort of conflicting decisions that 
give bite to vagueness concerns. And the reality is that 
prisoners are likely to pass pornographic materials about, so 
that prisoner-by-prisoner determinations may run aground on 
the "ripple effect" that the Court mentioned in Safley, 482 
U.S. at 90. Even if pornography could be directed only to 
those not likely to be adversely affected, it could find its way 
to others, interfering with their rehabilitation and increasing 
threats to safety.

 Of course the flip side of avoiding the costs and hazards of 
a grant of broad discretion to wardens is the possibility of 
preventing delivery of materials that, either generally or for a 
specific set of (effectively segregated) prisoners, pose little or 
no threat of the harm Congress sought to diminish. Outside 
prison walls this concern is addressed by the overbreadth 
doctrine. Here it seems to us captured in part by the 
demand for a rational relation between the regulation and the 
goal, and by consideration of alternatives under the fourth 
"factor." Thus, the objections to a more flexible standard--


such as one that would vest discretion in wardens to prevent 
delivery of materials in any case where in his judgment it 
would impair a specific prisoner's rehabilitation--go a long 
way to rebut the claim.

 The dissent, nonetheless, seems to regard only such a case-
by-case approach as constitutional, and makes much of vari-
ous hypothetical situations in which the categorical ban could 
unneccessarily exclude certain publications. See Dissent at 
15-21. To the extent that these hypotheticals assume direct 
enforcement of the Ensign Amendment, the likelihood of such 
enforcement is, as we have noted, quite remote and not 
before us in this case. Further, the actions of the Bureau of 
Prisons also suggest that the likelihood of this sort of exclu-
sion under the actual regulatory scheme is remote. The 
Bureau's Program Statement, for example, listing examples 
of permissible publications, cites National Geographic; Our 
Bod[ies], Our Selves; Sports Illustrated (Swimsuit Edition); 
and the Victoria's Secret Catalog. P.S. 5266.07, at 7. We find 
it all but impossible to believe that the Swimsuit Edition and 
Victoria's Secret pass muster while Michelangelo's David or 
concentration camp pictures fail; nor has there been any 
suggestion that any prison official has attempted to imple-
ment such a bizarre interpretation. As there is no allegation 
that women in segregated women's prisons are demanding 
Playboy, neither the possibility of such demand nor the 
Bureau's possible response assists plaintiffs in their over-
breadth claim.8

 Leaving aside these possible fringe applications of the 
regulation, we again note that the regulation by its terms only 
restricts pictures; a prisoner may read anything he pleases. 

__________
 8 To the extent that the Dissent's insistence on individualized 
determinations turns on a view that general rules with any impact 
on First Amendment values must correspond to the underlying 
reason in every application, see, e.g., Dissent at 1 (suggesting that 
government must show that "any pictorial display of nudity or 
sexual activity will be harmful to the rehabilitation of all prisoners") 
(emphasis in original), it asserts a burden that few general rules 
could satisfy.

The dissent's appeal to the value of ideas, pointing by way of 
example to the vistas opened for Malcolm X by his prison 
reading, see Dissent at 15-16, thus makes little sense here. 
Congress could, we think, reasonably be skeptical of the 
proposition that study of the pictures in Penthouse would 
help a prisoner become "an intelligent customer in the mar-
ketplace of ideas." If anything, the ban could strengthen the 
impact of literature by removing the distraction of pictures 
that in almost every case would be pornographic.

 In any event, even under conventional overbreadth doc-
trine outside of prison, overbreadth claims by those on the 
margins of pornography have fared poorly. See, e.g., Young 
v. American Mini Theatres, Inc., 427 U.S. 50, 61 (1976) 
("Since there is surely a less vital interest in the uninhibited 
exhibition of material that is on the borderline between 
pornography and artistic expression than in the free dissemi-
nation of ideas of social and political significance ... we think 
this is an inappropriate case in which to adjudicate the 
hypothetical claims of persons not before the Court.") And 
regardless of the type of speech at issue, narrow or improba-
ble excesses of a statute are not a ground for invalidation 
before application shows their reality:

 [W]here a statute regulates expressive conduct, the scope 
 of the statute does not render it unconstitutional unless 
 its overbreadth is not only "real, but substantial as well, 
 judged in relation to the statute's plainly legitimate 
 sweep." Even where a statute at its margins infringes 
 on protected expression, "facial invalidation is inappropri-
 ate if the 'remainder of the statute ... covers a whole 
 range of easily identifiable and constitutionally proscriba-
 ble ... conduct....' "

Osborne v. Ohio, 495 U.S. 103, 112 (1990) (citations omitted) 
(ellipses in original). Accordingly, such problems of applica-
tion can be left to the time when, if ever, they arise.

 We find that the statute and regulation satisfy Safley's 
demand for reasonableness, scoring adequately on all four 
factors.


 * * *

 Plaintiffs argue that if we are unpersuaded by the district 
court's analysis we should remand the case to allow them to 
introduce evidence supporting their position. But that sug-
gestion misconceives the legal issue under Safley. The ques-
tion is not whether curtailment of pictorial smut will advance 
the prisons' rehabilitative project, but whether Congress 
could reasonably have believed that it would do so. The 
studies cited above, coupled with Congress's implicit appeal to 
ethical norms against the undue stimulation of carnal appe-
tites, indicate the reasonableness of such a belief. If the 
Bureau of Prisons applies the regulations in a manner that 
would violate the Safley priciples, of course, that would be 
another case. Accordingly, the district court should have 
granted the defendants' motion to dismiss plaintiffs' com-
plaint insofar as that complaint rested upon Safley.

 
 * * *

 Besides the overbreadth issue, which we have already 
addressed in the Safley context, plaintiffs have raised two 
additional theories--excessive vagueness and a claim that the 
regulations' distinction between pictorial and verbal works is 
content-based. In fact, the distinction between pictorial and 
verbal works seems more directed to form than to content, 
and in any event we have seen that Safley's neutrality 
requirement both displaces conventional First Amendment 
strictures on content-based limits and is satisfied by these 
regulations. Although Safley may well function as an all-
encompassing free speech test for the circulation of reading 
materials in prison, supplanting otherwise applicable First 
Amendment doctrine, it may be that plaintiffs' vagueness 
claim has independent force. If it did, of course, the role of 
the Bureau of Prisons, as manager rather than as law enforc-
er, might well play an important role in resolution of the 
claim. Accordingly, as the district court has not addressed 
these vagueness issues, we remand the case for it to do so. 
In the meantime, we lift the permanent injunction that it has 
imposed on enforcement of the regulations.

 So ordered.

 Wald, Circuit Judge, dissenting: The prohibition to all 
federal prisoners of publications "featuring nudity" or depict-
ing "sexually explicit" activities indisputably raises First 
Amendment concerns. See, e.g., Reno v. American Civil 
Liberties Union, 117 S. Ct. 2329, 2346 (1997) ("In evaluating 
the free speech rights of adults, we have made it perfectly 
clear that sexual expression which is indecent but not obscene 
is protected by the First Amendment.") (internal quotation 
omitted); Martin v. Struthers, 319 U.S. 141, 143 (1943) 
(noting that the right of freedom of speech "necessarily 
protects the right to receive [publications]"). Indeed, if the 
First Amendment, at its core, is designed to promote the free 
exchange of ideas, the debate in this case goes to the very 
heart of its protections. The government argues that the 
reason all publications featuring nudity or sexually explicit 
material, whether or not they are pornographic or obscene, 
should be withheld from all federal prisoners is that any 
pictorial display of nudity or sexual activity communicates 
messages that are harmful to the rehabilitation of all prison-
ers. Relying on what it claims to be the inherent reasonable-
ness of a legislative judgment that such materials are always 
inimical to rehabilitation, the government throughout this 
case has steadfastly resisted creating any kind of record to 
support such a wide-reaching incursion on the constitutional 
rights of incarcerated individuals. Today, the majority un-
questioningly endorses the government's approach. Because 
I believe this result sets an unwise and arbitrary precedent 
that runs contrary to prior case law, I respectfully dissent.1

__________
 1 I find it very significant that two of our sister courts have 
recently reached results opposite from that set forth by the majori-
ty today. In Mauro v. Arpaio, 1998 WL 550190 (9th Cir. Sept. 1, 
1998), the Ninth Circuit invalidated a county prison system's ban on 
the possession of all materials containing "any graphic representa-
tion of frontal nudity." Although the county claimed that its 
interests in safety, the rehabilitation of inmates, and the reduction 
of sexual harassment of guards supported such a ban, the court held 
that the county had not "carried its burden to show that such a far 
reaching prohibition is 'reasonably related' to legitimate penological 
interests"; in particular, it had "offer[ed] no proof or reasoned 


 It appears to need restating once again that prisoners do 
not lose all their constitutional rights when the prison door 
clangs behind them. While the prison gate may serve to 
isolate those inside from the outside world, it does not, as the 
Supreme Court has taken pains to emphasize, "form a barrier 
separating prison inmates from the protections of the Consti-
tution." Turner v. Safley, 482 U.S. 78, 84 (1987). Although 
the majority pays lip service to this canon, it ignores an 
important corollary: Whatever sentiments we might hold 
regarding prisoners for the crimes they have committed, 
these sentiments must not infect our determination of the 
prisoners' constitutional rights. Indeed, the Supreme Court 
has recently reaffirmed, albeit in a different context, that " 'a 
bare ... desire to harm a politically unpopular group cannot 
constitute a legitimate governmental interest.' " Romer v. 
Evans, 517 U.S. 620, 634 (1996) (quoting Department of 
Agriculture v. Moreno, 413 U.S. 528, 534 (1973)) (invalidating 
state constitutional amendment prohibiting official action de-
signed to protect homosexual persons from discrimination). 
So long as prisoners retain constitutional rights, including 
First Amendment rights, see O'Lone v. Estate of Shabazz, 482 
U.S. 342, 348 (1987) ("Inmates clearly retain protections 

__________
explanation" for the ban. Id. at *7. And in Waterman v. Verniero, 
1998 WL 416585 (D.N.J. July 22, 1998), a district court invalidated a 
state statute prohibiting inmates in a specialized facility for sex 
offenders from possessing or obtaining "sexually oriented materi-
als" (defined as any description or depiction of "sexual activity or 
associated anatomical area"; see Waterman v. Verniero, 1998 WL 
354932, at *4 (D.N.J. June 29, 1998) (preliminary injunction)). 
Despite the state's claim that such materials would disrupt the 
rehabilitation of sex offenders at the institution, the court held that 
the state legislature that enacted the ban was motivated by public 
outrage over pedophiliac crimes rather than rehabilitative interests. 
Waterman, 1998 WL 416585, at *3. Moreover, the court noted, the 
literature on the effects of such publications was too unsettled to 
support a finding that a rational relationship existed between the 
ban and rehabilitative interests. Id. In both cases, the courts 
found the broad scope of the ban, in particular its application to 
publications featuring nudity, to be unjustifiable in light of any 
evidence advanced by the government to support it.

afforded by the First Amendment ...."), our duty is to 
ensure that these rights are not impermissibly curtailed.2

 It is equally true, however, that the unique and difficult 
task of running a prison will often necessitate some incursion 
on inmates' constitutional rights. A prisoner's desire to leave 
the prison once a week to attend religious services, for 
example, or his desire to correspond with other inmates may 
conflict with the prison's need to maintain institutional securi-
ty. In these instances, courts must give a large measure of 
deference to the prison administrators who are actively in-
volved in the daily operations of the institution. Courts are 
not in the best position to judge when or in what manner 
certain institutional interests may require some action on the 
part of prison officials to respond to the "complex and intract-
able" problems of prison administration. Procunier v. Mar-
tinez, 416 U.S. 396, 405 (1974), overruled in part by Thorn-
burgh v. Abbott, 490 U.S. 401 (1989). Most of these problems, 
as the Supreme Court reminds us, "require expertise, com-
prehensive planning, and the commitment of resources, all of 
which are peculiarly within the province of the legislative and 
executive branches of government." Id.

 As the majority has duly noted, the Court's standard in 
Safley recognizes the need to forge a balance between the 
competing interests of prison administration and prisoners' 
constitutional rights. As I read this standard, it embraces 
two principles. First, fundamental rights of prisoners must 
give way to governmental concerns more readily than the 

__________
 2 As our Chief Judge has previously noted,

 the special place of prisoners in our society makes them more 
 dependent on judicial protection than perhaps any other group. 
 Few minorities are so "discrete and insular," so little able to 
 defend their interests through participation in the political 
 process, so vulnerable to oppression by an unsympathetic ma-
 jority. Federal courts have a special responsibility to ensure 
 that the members of such defenseless groups are not deprived 
 of their constitutional rights.

Doe v. District of Columbia, 701 F.2d 948, 960 n.14 (D.C. Cir. 1983) 
(separate statement of Edwards, J.).

fundamental rights of nonprisoners. In adopting a test "less 
restrictive than that ordinarily applied to alleged infringe-
ments of fundamental constitutional rights," O'Lone, 482 U.S. 
at 349, the Court intended to ensure that "courts afford 
appropriate deference to prison officials," id. To require that 
prison regulations infringing upon fundamental rights under-
go strict scrutiny, as they would outside the prison context, 
would place an inordinately high obstacle in the way of prison 
administrators' attempts to run their institution safely and 
efficiently. Second, and significantly, the Court did not in-
tend Safley 's lesser standard of review to negate prisoners' 
constitutional rights altogether, as the majority seems to 
suggest. The Court did not say, for example, that prison 
regulations are valid if there is any conceivable basis for their 
existence, as rational basis review is typically formulated. 
See, e.g., United States R.R. Retirement Bd. v. Fritz, 449 U.S. 
166, 179 (1980) (noting that where, under rational basis 
review, "there are plausible reasons for Congress' action, our 
inquiry is at an end"). Rather, the task for courts is to 
determine, while giving appropriate deference to the judg-
ment of prison officials, whether a challenged regulation is, in 
fact, reasonable or whether it is an "exaggerated response" to 
the "legitimate governmental interest put forward to justify 
it." Safley, 482 U.S. at 89-90 (emphasis added); see also 
Laurence H. Tribe, American Constitutional Law 1445 n.21 
(2d ed. 1988) ("Any limit placed on the Court's imagination 
vis-a-vis legislative purpose must be recognized as a tightened 
form of scrutiny."). A governmental institution is permitted 
"regulation more intrusive than what may lawfully apply to 
the general public," Majority Opinion ("Maj.Op.") at 5, not 
simply because of its status but rather because of the identifi-
able, and unique, needs of that institution. And although the 
need for flexibility is perhaps at its highest in the prison 
environment, the need for limits on that flexibility is also 
paramount: Unlike government employees, students, or other 
participants in governmental institutions, prisoners have no 
choice about whether to be subject to the power of the state.

 To read Safley--as the majority appears to--as permitting 
unblinking deference to any "plausible" legislative judgment 


about the "rehabilitative" benefits of denying a prisoner's 
most fundamental constitutional right, i.e., her freedom to 
read, renders any and all prisoners' constitutional rights a 
nullity. I had thought it went without saying that courts do 
not rely on the mere assertion of a regulation's drafters that 
the regulation is reasonable; to do so would amount to an 
abdication of our judicial role. See, e.g., Salaam v. Lockhart, 
905 F.2d 1168, 1171 (8th Cir. 1990) ("We would misconstrue 
[Thornburgh, O'Lone, and Safley ] if we deferred not only to 
the choices between reasonable policies made by prison offi-
cials but to their justifications for the policies as well."); 
Campbell v. Miller, 787 F.2d 217, 227 n.17 (7th Cir. 1986) 
("[D]eference to the administrative expertise and discretion-
ary authority of correctional officials must be schooled, not 
absolute."). Nor can the judicial role be diminished to the 
disappearing point solely because the original decisionmaking 
body in this case is Congress itself rather than the Bureau of 
Prisons ("BOP"). Cf. Sable Communications of California, 
Inc. v. FCC, 492 U.S. 115, 129 (1989) ("To the extent that the 
federal parties suggest that we should defer to Congress' 
conclusion about an issue of constitutional law, our answer is 
that while we do not ignore it, it is our task in the end to 
decide whether Congress has violated the Constitution. This 
is particularly true where the Legislature has concluded that 
its product does not violate the First Amendment.").3 The 
Safley standard reconciles prisoners' constitutional rights 
with institutional needs and defers to prison administrators as 
the most appropriate articulators of those needs; so long as 
Congress acts with those same needs in mind, it is entitled to 
the same deference. But were we simply to defer to Con-
gress's assertion that the Ensign Amendment ("the Amend-
ment") was reasonably related to the interest asserted, there 
would be no need for judicial review at all, for no statute 

__________
 3 Of course, because the majority concludes that the BOP's regu-
lations, and not the Ensign Amendment, are controlling in this case, 
the majority's focus on Congress's conclusions may be misguided. 
See, e.g., Maj. Op. at 11 ("It does not matter whether we agree with 
the legislature, only whether we find its judgment rational."). But 
see note 4, infra.


infringing on inmates' constitutional rights would fail to satis-
fy this test. The Court has reminded us that the Safley 
standard "is not toothless," Thornburgh, 490 U.S. at 414 
(internal quotation omitted); more precisely, it is not a license 
for lawmakers, any more than prison wardens, to shortchange 
the constitutional rights that the Supreme Court has insisted 
prisoners continue to possess. Only if our assessment is not 
a cursory one can we give adequate weight to both concerns 
that underlie the Safley standard. See, e.g., Salaam, 905 
F.2d at 1171 n.6 ("Reasonableness in this context refers not 
only to the relation between the goals of a regulation and its 
means, but also to the balance struck between the needs of 
the prison administrators and the constitutional rights of 
prisoners.").

 It is crucial, therefore, to ensure that although the strict-
ness of our review is lessened, it is not eliminated altogether. 
Our task, ultimately, is to assess the fit between the interest 
proffered and the remedy adopted--whether the regulation 
under consideration is a reasonable means of addressing the 
legitimate penological interest put forward by the govern-
ment. In Safley itself, for example, although the prison's 
asserted interests in security and rehabilitation were suffi-
cient to justify some restriction on the right to marry, the 
Court held that the particular restriction adopted was too 
broad to be upheld. See Safley, 482 U.S. at 97-98 ("No doubt 
legitimate security concerns may require placing reasonable 
restrictions upon an inmate's right to marry, and may justify 
requiring approval of the superintendent. The Missouri reg-
ulation, however, represents an exaggerated response to such 
security objectives."); id. at 98 ("[I]n requiring refusal of 
permission absent a finding of a compelling reason to allow 
the marriage, the rule sweeps much more broadly than can be 
explained by petitioners' penological objectives."). In Thorn-
burgh, by contrast, the pre-Amendment version of the restric-
tions under consideration here were found to represent a 
reasonable response to institutional concerns because the 
"individualized nature" of the determinations ensured that the 
policy would not result in "needless exclusions." Thornburgh, 
490 U.S. at 416-17; see also id. (noting that even a publica-


tion that met one of the criteria for exclusion would be 
rejected "only if it is determined to meet that standard under 
the conditions prevailing at the institution at the time"). 
These cases illustrate that the standard of review established 
by Safley sets some limits on the means the government may 
use to further penological interests. Although these limits 
are flexible, they are by no means as vaporous as the majori-
ty rules them to be.

 I agree that rehabilitation is, conceptually, a legitimate 
governmental interest, even if no one is sure how to achieve it 
and the Federal Sentencing Guidelines have abandoned it as 
an attainable goal. Compare Pell v. Procunier, 417 U.S. 817, 
823 (1974) ("[S]ince most offenders will eventually return to 
society, another paramount objective of the corrections sys-
tem is the rehabilitation of those committed to its custody.") 
and Dawson v. Scurr, 986 F.2d 257, 260 (8th Cir. 1993) 
(noting that rehabilitation is a "legitimate objective") with 
Kerr v. Puckett, 138 F.3d 321, 324 (7th Cir. 1998) ("Congress 
abandoned 'rehabilitation' as a justification of imprisonment 
when it enacted the Sentencing Reform Act of 1984.") and S. 
Rep. No. 98-225 (1983), at 38, reprinted in 1984 U.S.C.C.A.N. 
3182, 3221 ("[A]lmost everyone involved in the criminal justice 
system now doubts that rehabilitation can be induced reliably 
in a prison setting, and it is now quite certain that no one can 
really detect whether or when a prisoner is rehabilitated."). 
Where the majority and I part company is on the ultimate 
question: Has any "valid, rational connection" between the 
extremely broad ban on publications featuring nudity or 
explicit sexual activity and rehabilitation been shown in this 
case? And while I certainly do not discount the possibility 
that a ban more narrowly targeted on certain kinds of violent 
pornography or even on certain types of prisoners might 
satisfy this requirement, I cannot conclude, on the present 
record, that these regulations implementing the Amendment 
pass muster.4

__________
 4 The majority characterizes Amatel's attack on the Amendment 
itself as a "pre-enforcement challenge" that is invalid because, in 
promulgating implementing regulations, the government has 


 I believe that the determination of whether a regulation (or 
statute) is reasonably related to a legitimate penological 
interest must depend, in all but the most obvious cases, on 
the evidentiary support for that nexus in the record before 
the court. Of course I recognize too that the question of 
what or how much evidence is necessary may depend on what 
logic or everyday experience show us to be the connection 
between the disputed means and the rehabilitative end. If 
the Amendment prohibited the distribution of publications 
containing escape plans, the connection between the ban and 
the penological interest in institutional security would be 
obvious, and we could uphold such a prohibition based on 
little or no demonstrated evidence. Where, as here, however, 
the connection (between nudity and rehabilitation) is far 
murkier, courts (and I would include legislators as well) far 
removed from the day-to-day operations of a prison are much 

__________
"waived certain provisions of the law." Maj. Op. at 4, citing 
Salvation Army v. Department of Community Affairs, 919 F.2d 
183, 192 (3d Cir. 1990). In contrast to Salvation Army, however, 
we have no "express assurance" that the BOP will not enforce the 
breadth of the Amendment, cf. Salvation Army, 919 F.2d at 192; 
indeed, the regulations state simply that "publications containing 
nudity illustrative of medical, educational, or anthropological con-
tent may be excluded" from the definition of "features," see 28 
C.F.R. s 540.72(b)(3) (1997) (emphasis added). Moreover, at oral 
argument, counsel for the BOP acknowledged that under the cur-
rent regulations, wardens retain considerable discretion as to 
whether a publication "features" nudity. See Tr. of Oral Arg. at 6. 
The government's "waiver" of certain portions of the Amendment 
thus cannot be so blithely assumed and may in fact be an impermis-
sible narrowing of the Amendment's mandate. See, e.g., Public 
Citizen v. FTC, 869 F.2d 1541, 1557 (D.C. Cir. 1989) ("While 
agencies may safely be assumed to have discretion to create excep-
tions at the margins of a regulatory field, they are not thereby 
empowered to weigh the costs and benefits of regulation at every 
turn; agencies surely do not have inherent authority to second-
guess Congress' calculations."); Alabama Power Co. v. Costle, 636 
F.2d 323, 358 (D.C. Cir. 1979) ("Categorical exemptions from the 
clear commands of a regulatory statute, though sometimes permit-
ted, are not favored.").

less able to answer the question accurately on their own; 
indeed, the very reason that Safley prescribes a great mea-
sure of deference to prison administrators is that they are in 
the best position to provide answers involving means and 
ends in prison administration. See, e.g., Kennedy v. Los 
Angeles Police Dep't, 901 F.2d 702, 713 (9th Cir. 1989) ("The 
principle that courts must provide wide latitude to prison 
policies needed to maintain institutional order and security 
necessarily presupposes that the administrators have crafted 
those policies with careful deliberation.") (citation omitted). 
We would normally be expected to give a healthy dose of 
deference to the judgment of prison officials as to their 
experience and apprehensions in support of a regulation, but 
where, as in these regulations, these same officials were, so 
far as we can tell, never consulted on the Amendment's 
merits and under its terms are not allowed to exercise any 
judgment about what kinds of nudity or sexually explicit 
material are allowed inside the prison walls, I do not believe 
Safley permits us simply to assume the existence of evidence 
showing a connection between the regulation and a rehabilita-
tive goal, as we might under rational-basis review and as the 
majority has in fact done here.

 Safley itself provides a useful example of how too Spartan a 
record can doom a regulation. The Court's rejection of the 
marriage restriction at issue in that case clearly turned on the 
quality of the evidence before the Court; four times the 
Court concluded that the regulation was not reasonably relat-
ed to penological interests based "on this record." See Saf-
ley, 482 U.S. at 97 ("We conclude that on this record, the 
Missouri prison regulation, as written, is not reasonably 
related to these penological interests."); id. at 98 ("Nor, on 
this record, is the marriage restriction reasonably related to 
the articulated rehabilitation goal."); id. at 99 ("Moreover, 
although not necessary to the disposition of this case, we note 
that on this record the rehabilitative objective asserted to 
support the regulation itself is suspect."); id. ("On this 
record, however, the almost complete ban on the decision to 
marry is not reasonably related to legitimate penological 
objectives.") (emphases added). This repeated qualification 


of the Court's negative conclusion about the validity of the 
regulation starkly suggests that while a reasonable relation-
ship might possibly have been demonstrated between the 
marriage restriction and the interests asserted, the prison 
had failed to present sufficient evidence to establish that 
relationship.

 The majority's apparent conclusion that the government 
bears no responsibility for compiling evidence to support the 
breadth of its ban--in other words, that the courts may 
simply hypothesize a rational connection--runs counter to the 
wisdom of several other circuit courts. See, e.g., Shimer v. 
Washington, 100 F.3d 506, 509 (7th Cir. 1996) (prison admin-
istration "must proffer some evidence to support its restric-
tion of ... constitutional rights" under Safley standard); 
Mann v. Reynolds, 46 F.3d 1055, 1061 (10th Cir. 1995) 
(invalidating restrictions on contact visits with attorneys, 
noting that "defendants were unable to provide any evidence 
the restrictions on contact were reasonably related to prison 
security"); Muhammad v. Pitcher, 35 F.3d 1081, 1085 (6th 
Cir. 1994) (invalidating prison mail regulation because "there 
is no evidence in the record supporting Defendants' factual 
claim" that policy was reasonably related to interest in con-
serving resources); Walker v. Sumner, 917 F.2d 382, 386 (9th 
Cir. 1990) ("Prison authorities cannot rely on general or 
conclusory assertions to support their policies. Rather, they 
must first identify the specific penological interests involved 
and then demonstrate both that those specific interests are 
the actual bases for their policies and that the policies are 
reasonably related to the furtherance of the identified inter-
ests. An evidentiary showing is required as to each point."); 
Waterman, 1998 WL 354932, at *10 ("To establish that a 
legitimate penological interest supports a statute, a state 
must provide evidence that the interest it proffered is the 
actual basis for the statute."); Powell v. Riveland, 991 F. 
Supp. 1249, 1254 (W.D. Wash. 1997) (upholding restriction on 
sexually explicit incoming mail where "[p]rior to implement-
ing the policy, research was done on the effects of sexually 
explicit material and the policy/regulation was written to 
target those harmful materials"). In sum, it is clear, as 


Judge Posner has suggested, that the Safley analysis cannot 
be met simply on the basis of "pure conjecture." Reed v. 
Faulkner, 842 F.2d 960, 963 (7th Cir. 1988); see also id. 
("[T]o suppose that the wearing of dreadlocks [as an expres-
sion of religious belief] would lead to racial violence is, on this 
record, the piling of conjecture upon conjecture. The poten-
tial infringement of the free-speech clause of the First 
Amendment is too plain to warrant comment."). Safley cer-
tainly does not stand for the proposition that Congress or 
prison officials may "set constitutional standards by fiat." 
Whitney v. Brown, 882 F.2d 1068, 1074 (6th Cir. 1989).

 I might, therefore, have been able to go along--as the 
majority does here--with deferring to Congress had the 
government seen fit to proffer evidence that links a ban on 
the prohibited publications to rehabilitation or if the connec-
tion between that ban and rehabilitation was so self-evident 
that no further evidence was necessary to demonstrate its 
reasonableness. But neither event has occurred, and the 
majority's once-over-lightly of the scientific literature that 
does exist certainly does not accomplish the task, as the 
majority itself admits. See Maj. Op. at 14 ("The point of this 
is not to suggest that a causal link has been shown. The 
array of academic authority on the other side is at least as 
substantial, and quite possibly more so."). At best, it can be 
said that a few studies have shown a causative relationship 
between violent pornography and short-term increases in 
aggression--perhaps a helpful finding with regard to the 
security interests of prison authorities but next to useless in 
determining the effect on any long-term interest in rehabilita-
tion.5 In all other respects, the relationship between pornog-

__________
 5 Of course, the evidence to support a prison regulation need not 
be in the form of scholarly studies; affidavits from prison officials 
could also suffice as the basis for analysis. See, e.g., Safley, 482 
U.S. at 98 (testimony of prison officials that they had experienced 
no problems with the marriages of male inmates relied on as 
evidence that ban was overbroad); Harper v. Wallingford, 877 F.2d 
728, 733 (9th Cir. 1989) (finding prison regulation banning receipt of 
material espousing consensual sexual relationships between male 


raphy and criminal activity is merely correlative,6 and there is 
no evidence that simply viewing nonpornographic nudity or 
depictions of sexual activities (as opposed to pornography) 
has any effect at all.7 See, e.g., Edward Donnerstein, Daniel 
Linz & Steven Penrod, The Question of Pornography 177 
(1987) (stating conclusion of Attorney General's Commission 
on Pornography that "in general, the scientific evidence 
shows no causal relationship between exposure to [nonviolent 
and nondegrading sexual] depictions and acts of sexual vio-
lence" and noting that the authors' "view of the scientific 
literature ... is in agreement with this conclusion"); id. at 
40-48 (citing studies finding that exposing already angered 
men to nonviolent pornography can cause a short-term in-
crease in their aggressive tendencies); Ernest D. Giglio, 
Pornography in Denmark: A Public Policy Model for the 
United States? in 8 Comparative Social Research 281, 285 
(Richard F. Tomasson ed., 1985) ("[A] positive causal relation-
ship between pornography and sex crimes has not been 
documented by criminologists and psychologists."); Berl 
Kutchinsky, Obscenity and Pornography: Behavioral As-
pects, in Encyclopedia of Crime and Justice 1077, 1083 
(Sanford Kadish ed., 1983) (noting that the authoritative 
studies on the link between pornography and crime have 
concluded that there is apparently no causative relationship 
between nonviolent pornography and sex crimes). Indeed, it 

__________
adults and juvenile males to be reasonably related to rehabilitation 
based on affidavit from prison psychiatrist).

 6 Correlation cannot be sufficient to satisfy Safley 's requirement 
of a "valid, rational connection." Even if it could be shown, for 
example, that the majority of those who commit violent crimes are 
also avid Bible readers, this finding would not constitute a basis for 
prohibiting all prisoners from reading the Bible.

 7 By pornography, I mean "a depiction (as in writing or painting) 
of licentiousness or lewdness: a portrayal of erotic behavior de-
signed to cause sexual excitement." Webster's Third New Interna-
tional Dictionary 1767 (1976). There is, of course, much material 
that features nudity or depicts sexual activity that would not qualify 
as pornography under any definition, including many highly regard-
ed works of art.

is unclear even in the studies finding a positive connection 
between violent pornography and aggressive behavior wheth-
er the aggression is due to the violent content of the material 
or its sexual content. See, e.g., Larry Baron & Murray A. 
Straus, Four Theories of Rape in American Society 8 (1989) 
("It seems reasonable to conclude ... that it is the violent 
content rather than the sexual content that facilitates aggres-
sion."); Richard A. Posner, Sex and Reason 368 (1992) ("[T]he 
effects [of violent pornography] may be due to the violence 
per se rather than to the erotic component."). Thus, while it 
is entirely possible that a narrower publication ban than that 
accomplished by the Amendment could be supported by the 
available literature, cf., e.g., Dawson, 986 F.2d at 262 (uphold-
ing regulation limiting time, place, and conditions under 
which certain inmates could view materials), neither the 
government nor the majority has laid the barest foundation 
for the far-reaching ban promulgated. The majority's level of 
comfort in relying on any statement of any legislator as to 
what he thinks will encourage rehabilitation as the sole basis 
for taking away a First Amendment right is very surprising 
to me, especially since its holding today goes far beyond what 
any court has previously condoned in depriving prisoners of 
constitutional rights on the mere assertion of a legislator that 
he supposes rehabilitation to be so advanced.

 In this respect, I believe that it needs to be stressed that 
the assertion of "rehabilitation" as the reason for impinging 
on prisoners' First Amendment rights is particularly discon-
certing in its potential for abuse. Unlike its interest in 
institutional security, the contours of the government's inter-
est in rehabilitation are quite amorphous and ill-defined. At 
the most basic level, the goal of rehabilitation might be stated 
as returning the prisoner to society in a state so that he will 
henceforth behave in a law-abiding manner, but no one, not 
even Congress, is so immodest as to claim secure knowledge 
of how this goal is to be achieved in individual cases, let alone 
in the aggregate; most often, rehabilitation efforts involve 
therapy, drug and alcohol counseling, basic education, or job 
training, but even in these positive attempts, the results are 
far from reassuring. Against that backdrop, it is extremely 


difficult, if not impossible, to ascertain precisely if or how a 
particular publication may work to frustrate the rehabilitative 
goals of prisoners. To start with, there is no consensus on 
whether in order to transform a law violator into a good 
citizen, he must be "remolded" attitudinally and instilled with 
desirable values or whether it is sufficient that he be con-
vinced that further criminal activity would be counterproduc-
tive in his own case, whatever his vision of society or the 
world. Rehabilitation may also be viewed--in the majority's 
parlance--as an effort to direct the "character growth" of 
prisoners by limiting the reading materials to which he has 
access. See Maj. Op. at 11. But, whatever the rehabilitative 
vision, it should not be possible to proceed on some vague 
assertion of an interest in "rehabilitation" without the need to 
define the term or to show a connection between the pro-
scribed activity and the chosen definition; to do so runs an 
overwhelming risk of overregulation and invasion of the in-
nermost recesses of the human mind and spirit. Indeed, 
undertaking the Herculean task of "character-molding" is 
inherently problematic in its First Amendment implications, 
for it presumably involves casting emerging prisoners in 
society's own image. This, of course, is the antithesis of First 
Amendment freedoms; indeed, "[t]otalitarian ideologies we 
profess to hate have styled as 'rehabilitation' the process of 
molding the unorthodox mind to the shape of prevailing 
dogma." Sobell v. Reed, 327 F. Supp. 1294, 1305 (S.D.N.Y.
1971); cf., e.g., Tinker v. Des Moines Indep. Community 
Sch. Dist., 393 U.S. 503, 511 (1969) (noting "this Nation's 
repudiation of the principle that a State might so conduct its 
schools as to foster a homogeneous people") (internal quota-
tion omitted). Under this theory, lawmakers who believe that 
books on Russian history may lead to disrespect for the 
United States may ban those books for prisoners; lawmakers 
who hold pro-life views may prevent prisoners from reading 
publications describing Roe v. Wade; and lawmakers who 
hold an antiquated view of the role women should play in 
society may ban the distribution in prisons of publications 
with feminist themes. Each of these actions could logically 
be taken in the name of rehabilitation, broadly defined, and 


each, without doubt, would contribute to a continual eviscer-
ation of the First Amendment rights of prisoners. Cf., e.g., 
Stanley v. Georgia, 394 U.S. 557, 565-66 (1969) ("Our whole 
constitutional heritage rebels at the thought of giving govern-
ment the power to control men's minds.... [I]t cannot 
constitutionally premise legislation on the desirability of con-
trolling a person's private thoughts."); McCabe v. Arave, 827 
F.2d 634, 638 (9th Cir. 1987) ("Given the strength of First 
Amendment protection for freedom of belief, prison authori-
ties have no legitimate penological interest in excluding reli-
gious books from the prison library merely because they 
contain racist views.") (citation omitted); American Booksel-
lers Ass'n, Inc. v. Hudnut, 771 F.2d 323, 330 (7th Cir. 1985), 
aff'd mem., 475 U.S. 1001 (1986) ("If the fact that speech 
plays a role in a process of conditioning were enough to 
permit governmental regulation, that would be the end of 
freedom of speech."). These examples may sound extreme--
they are--but the majority's rationale easily encompasses 
them in its umbrella-like authorization for restricting prison-
ers' reading material on the basis of a minimum plausibility 
test for tying the censorship to some vague rehabilitation 
concept.

 Even if the goal of rehabilitation is a more modest one--to 
convince the prisoner his own best interest lies in avoiding 
future crime--it is hard to see how that goal is furthered by 
returning him unequipped to be an intelligent customer in the 
marketplace of ideas. And while serious questions may well 
be raised about the value of some of the publications banned 
under the Amendment, there is much that falls under this 
broad ban that speaks intelligently to mankind, including 
prisoners: Michelangelo's David, for example, or grim photo-
graphs of naked bodies piled in the pits of Germany's concen-
tration camps.8 There is even a potential for such depictions 

__________
 8 The majority suggests that the application of the regulations to 
prohibit artistic depictions of nudity or to documentary photographs 
of wartime atrocities would be "bizarre." See Maj. Op. at 17. But, 
in fact, even the regulations do not provide for any exceptions to the 
nudity ban based on a publication's artistic or political content. See 
28 C.F.R. s 540.72(b)(3) (providing possible exception only for 

of nudity to strike a life-changing chord with some prisoners, 
a change that should not be prevented from coming to 
fruition. Malcolm X wrote of his prison experience:

 I have often reflected upon the new vistas that reading 
 opened to me. I knew right there in prison that reading 
 had changed forever the course of my life. As I see it 
 today, the ability to read awoke inside me some long 
 dormant craving to be mentally alive.... My home-
 made education gave me, with every book that I read, a 
 little bit more sensitivity to the deafness, dumbness, and 
 blindness that was afflicting the black race in America.

Alex Haley & Malcolm X, The Autobiography of Malcolm X 
180 (1965).9

 If rehabilitation is to be deemed a legitimate penological 
interest, the term must be given some shape, at least when it 
collides with fundamental liberties. Of course, as the majori-
ty notes, the Constitution has nothing to say about what 
messages the government may choose to communicate as a 
speaker. See, e.g., Rust v. Sullivan, 500 U.S. 173, 193 (1991) 
("The Government can, without violating the Constitution, 
selectively fund a program to encourage certain activities it 
believes to be in the public interest, without at the same time 
funding an alternate program which seeks to deal with the 
problem in another way."). Congress or the BOP may make 

__________
nudity "illustrative of medical, educational, or anthropological con-
tent"). And although the Victoria's Secret catalog and the Sports 
Illustrated Swimsuit Edition are listed by the BOP as permissible 
publications, the basis for their exclusion from the ban is left to 
conjecture. Cf. id. s 540.72(b)(2) (defining "nudity" as "a pictorial 
depiction where ... female breasts are exposed"). As for the 
notion that explicit descriptions of sexual activities and nudity are 
still permitted (an illustrated version of Henry Miller's Tropic of 
Cancer is banned but a nonillustrated version is not), this only 
underscores the arbitrariness of the rehabilitative nexus.

 9 Of course, lawmakers who believe that Malcolm X inspires 
separatism and racial consciousness may, under the "remolding" 
theory of rehabilitation, prohibit prisoners from reading his writings 
as well.

whatever recreational reading it wishes available in the prison 
libraries without offending the Constitution; they may even 
provide each prisoner with a tract on the harms of pornogra-
phy in the hope that some readers will take its lessons to 
heart. But it is quite a different matter for prisons to deny 
all access to certain publications in the name of rehabilitation, 
particularly in such a broad and overreaching manner as this 
one. If prisoners are to retain any First Amendment rights, 
the mere assertion of "rehabilitation" as the interest to be 
served by a particular regulation cannot serve to extinguish 
those rights altogether.

 Because the Amendment and the regulations eliminate the 
discretion of prison wardens to make individual determina-
tions about how particular publications will affect particular 
prisoners in particular prison settings, even rehabilitatively, I 
believe it was incumbent upon the government to point to 
some evidence demonstrating a connection between all publi-
cations that are sexually explicit or that feature nudity and a 
tendency to engage in criminal or disruptive behavior, keep-
ing in mind that our task is to determine whether such a 
connection is reasonably likely to exist, not whether one 
might be conceivable. Cf., e.g., Mauro, 1998 WL 550190, at 
*7 (considering whether all materials depicting nudity are 
"reasonably likely" to cause violence or to be used to harass 
guards). Neither the government nor the majority has point-
ed to any such evidence.

 Indeed, the proposition that all material that is sexually 
explicit or that features nudity will have a detrimental effect 
on rehabilitation is belied by the prior actions of the prison 
officials under the pre-Amendment policy. At that time, 
prison officials were authorized to prohibit sexually explicit 
materials that they believed would negatively affect the disci-
pline or "good order" of the institution. Significantly, the 
prison officials--to whose expertise the Supreme Court has 
repeated deferred on matters such as this--did not choose to 
prohibit all material that is sexually explicit or that features 
nudity. Rather, they evaluated the publications individually 
to determine which ones, in their expert opinions, posed a 
potential threat and which did not; indeed, as the majority 

notes, "explicit heterosexual material" was ordinarily admit-
ted. See Thornburgh, 490 U.S. at 405 n.6 (quoting Program 
Statement 5266.5(b)(2)). It was this "individualized nature" 
of the determinations that led the Thornburgh Court to 
conclude that the regulations at issue in that case were 
rationally related to security interests, the nature of which, 
like rehabilitation, can change over time.10 See Thornburgh, 
490 U.S. at 417 ("We agree that it is rational for the Bureau 
to exclude materials that ... are determined by the warden 
to create an intolerable risk of disorder under the conditions 
of a particular prison at a particular time.").

 Because I believe that, on this record, there is no basis for 
concluding that there is a rational connection between the 
interest asserted by the government--rehabilitation--and the 
restriction chosen to further that interest--a ban on the 
delivery to all federal prisoners of all publications that are 

__________
 10 It should be noted in this respect that a seemingly innocuous 
publication may be quite detrimental to a prisoner's rehabilitation, 
depending on the circumstances. See, e.g., Waterman, 1998 WL 
354932, at *3, *4 (citing concerns of prison officials that pictures of 
children from the Sears catalog should not be seen by pedophile 
prisoners).

 The need for individualistic determinations when behavior modifi-
cation is at stake was also a concern in Washington v. Harper, 494 
U.S. 210 (1990), in which the Court upheld a prison policy that 
permitted the involuntary administration of antipsychotic drugs to 
inmates, given that the policy was not unnecessarily broad and 
supported by a wealth of evidence:

 Its exclusive application is to inmates who are mentally ill and 
 who, as a result of their illness, are gravely disabled or 
 represent a significant danger to themselves or others. The 
 drugs may be administered for no purpose other than treat-
 ment, and only under the direction of a licensed psychiatrist. 
 There is considerable debate over the potential side effects of 
 antipsychotic medications, but there is little dispute in the 
 psychiatric profession that proper use of the drugs is one of the 
 most effective means of treating and controlling a mental 
 illness likely to cause violent behavior.

Id. at 226.

sexually explicit or that feature nudity, I would affirm the 
decision of the district court. As the majority considers the 
remaining Safley factors, however, I will also offer a few 
thoughts.

 The second Safley factor considers whether there are "al-
ternative means of exercising the right that remain open to 
prison inmates." Safley, 482 U.S. at 90. Although this right 
must be viewed "sensibly and expansively," Thornburgh, 490 
U.S. at 417, it cannot be viewed so broadly as to eliminate any 
reason for analysis (or as unhelpfully as the majority's sar-
donic reference to an "entitlement to smut"). The Thorn-
burgh Court, for example, noted that although the regulation 
under consideration in that case permitted the warden to 
make individualized determinations as to each publication, an 
exercise of discretion that might appear to produce inconsis-
tent results, "greater consistency might be attainable only at 
the cost of a more broadly restrictive rule against admission 
of incoming publications," which "might itself run afoul of the 
second [Safley ] factor." Id. at 417 n.15. Because the 
Amendment eliminates a wide variety of publications that 
feature nudity for artistic or other reasons, prisoners do not 
have sufficient means of exercising their right to receive 
many constitutionally protected materials. Cf., e.g., Mauro, 
1998 WL 550190, at *8 ("[I]n direct contradiction of the 
Supreme Court's cautionary language in Thornburgh, Marico-
pa County has enacted a regulation that sweeps too broadly, 
indiscriminately eliminating large categories of materials 
without individualized consideration.").

 The third factor considers "the impact accommodation of 
the asserted constitutional right will have on guards and 
other inmates." Safley, 482 U.S. at 90. Where the institu-
tional interest asserted for a publication ban is security, 
accommodation of the inmate's First Amendment rights may 
indeed cause the "ripple effect" of which the Safley Court 
warned, see id.; a breach of security with respect to one 
prisoner is likely to result in other breaches in the prison. In 
this case, however, there is no evidence by which to judge 
whether permitting certain inmates to view publications that 
are sexually explicit or that feature nudity will have an 

adverse effect on the rehabilitation of other inmates. Reha-
bilitation is a gradual process, and it is entirely possible that 
any momentary lapses caused by the inadvertent receipt of an 
inappropriate publication may be reversed with additional 
rehabilitative efforts. This is not true of security breaches: 
Once an inmate has received information on how to escape 
from the prison, he cannot be made to forget it. It thus 
cannot be concluded, on this record, that accommodation of 
Amatel's First Amendment right will have a significant effect 
on the rehabilitation of other inmates.

 Finally, the fourth factor considers whether there are 
"obvious, easy alternatives" that "fully accommodate[ ] the 
prisoner's rights at de minimis cost to valid penological 
interests"; if so, this may be evidence that the regulation is 
an "exaggerated response" to prison concerns. Id. at 90-91. 
One such alternative comes immediately to mind: the pre-
Amendment policy, under which wardens had discretion to 
examine each incoming publication and determine whether 
institutional interests favored its prohibition. The Court's 
approval of this policy in Thornburgh eliminates any concerns 
the majority might have that such a policy would be deemed 
arbitrary or particularly burdensome; indeed, since prison 
officials under the current policy must examine each publica-
tion to determine whether it is sexually explicit or features 
nudity, the prior policy arguably represents no additional 
administrative burden.

 Moreover, other aspects of the Amendment suggest that it 
is indeed an "exaggerated response" to rehabilitative con-
cerns. The Amendment does not allow the warden to take 
into account whether a prisoner is in a high- or low-security 
institution, whether a prisoner is male or female, what kinds 
of crimes the prisoner has committed,11 the nature of the 

__________
 11 For example, the government has provided no evidence on why 
a ban on nudity is necessary to rehabilitate those convicted of 
nonsexual and/or nonviolent crimes. I can think of no reason why 
an embezzler, a tax evader, or a person held in contempt for 
refusing to testify will be rehabilitated if prevented from looking at 
publications that "feature" nudity. (The statements of the only two 


prisoner's sentence,12 how long the prisoner has been incar-
cerated and how long he or she has left to serve, whether the 
prisoner is receiving rehabilitative treatment,13 or even 
whether a prisoner is in a prison environment that provides 
an opportunity to share the material with anyone else (partic-
ularly with other prisoners convicted of sex crimes). In these 
respects, the Amendment "sweeps much more broadly than 
can be explained by [the government's] penological objec-
tives." Safley, 482 U.S. at 98 (invalidating ban on all prisoner 
marriages by noting that prison officials had experienced no 
problems with marriages by male inmates or with inmate-
civilian marriages; the prison's rehabilitative concern "ap-
pear[ed] from the record to have been centered almost exclu-
sively on female inmates marrying other inmates or ex-

__________
members of Congress who offered floor comments on the Amend-
ment suggest that their concern was with sex offenders. See 142 
Cong. Rec. H8262 (daily ed. July 24, 1996) ("[I]f we do not adopt 
my amendment, we are sending the message that it is OK to 
provide sexually explicit magazines and books to the very prisoners 
who have committed violent acts against women.") (statement of 
Rep. Ensign); id. ("Far too often, those individuals convicted of 
crimes have the opportunity, while in prison, to use materials that 
glamorize the very acts for which they were convicted.") (statement 
of Rep. Christensen).)

 Moreover, the Amendment's ban may also extend to those in-
mates who have not yet been convicted but rather are imprisoned 
while awaiting trial. The government has not suggested any reason 
for it to take a rehabilitative interest in these individuals, nor do I 
think it can legitimately do so. See, e.g., McGinnis v. Royster, 410 
U.S. 263, 273 (1973) ("[I]t would hardly be appropriate for the State 
to undertake in the pretrial detention period programs to rehabili-
tate a man still clothed with a presumption of innocence.").

 12 The government would seem to have less rehabilitative interest 
in, for example, prisoners who have been sentenced to life in prison 
without parole or to death.

 13 In some prisons, material featuring adult nudity is an effective 
part of a rehabilitative program. See, e.g, Waterman, 1998 WL 
354932, at *7 (citing evidence that adult pornography may be 
helpful in turning pedophiles away from child pornography).

felons," id. at 99, and thus did not account for the ban on 
other inmate marriages).

 The majority's decision to remand this case for further 
consideration of Amatel's vagueness challenge leaves a scintil-
la of hope that this ill-conceived statute will ultimately fail. 
Because I cannot agree with the majority's Safley analysis, 
however, or with its decision to lift the district court's injunc-
tion in the interim, I respectfully dissent.

 Conclusion

 Justice Holmes once remarked that hard cases make bad 
law. See Northern Sec. Co. v. United States, 193 U.S. 197, 
400 (1904) (Holmes, J., dissenting). Claims of prisoners to 
read magazines like Playboy or Penthouse may not be the 
ideal vehicles for the articulation of First Amendment rights. 
But, as Dostoyevsky observed, "the degree of civilization in a 
society is revealed by entering its prisons." F. Dostoyevsky, 
The House of the Dead 76 (C. Garnett trans., 1957). Today's 
ruling that prisoners may be stripped of rights to view 
publications of their choice on the mere assertion of legisla-
tors or regulators--far removed from the prison scene and 
without supporting evidence of any kind--that those publica-
tions will hinder their "rehabilitation" goes well beyond prior 
precedent and the case law in other circuits. It is a most 
troubling precedent.